IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| BRAD HABERLAND, derivatively on behalf of DEX ONE CORPORATION,<br><br>Plaintiff,<br><br>v.<br><br>JONATHAN B. BULKELEY, EUGENE I. DAVIS, RICHARD L. KUERSTEINER, W. KIRK LIDDELL, MARK A. MCEACHEN, ALFRED T. MOCKETT, ALAN F. SCHULTZ, STEVEN M. BLONDY, GEORGE F. BEDNARZ, MARK W. HIANIK, SEAN W. GREENE, and DAVID C. SWANSON,<br><br>Defendants,<br><br>and<br><br>DEX ONE CORPORATION,<br><br>Nominal Defendant. | Civil Action No.<br><br><br><br><br><br><br><br><br><br>**JURY TRIAL DEMANDED** |

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1.      This is a verified shareholder derivative action on behalf of nominal defendant Dex One Corporation ("Dex" or the "Company") against Dex's Board of Directors (the "Board") and certain of Dex's current and former executive officers. This action seeks to hold defendants liable for breach of their fiduciary duties of candor, good faith and loyalty, unjust enrichment, and aiding and abetting from 2010 to the present (the "Relevant Period") in connection with the award of excessive and unwarranted 2010 executive compensation.

### NATURE OF THE ACTION

2.      This is a failed "say on pay" shareholder derivative action, arising from the Board's unwarranted and excessive spending of Company (*i.e.*, stockholders') funds on executive compensation -- namely, the Board's recent authorization of substantially increased 2010 compensation for executives who not long ago drove the Company to the brink of ruin and into bankruptcy. In particular, the 2010 executive compensation awarded to top Dex executives was as

1

much as *298%* greater than prior year's awards. These massive pay increases were awarded by the Board improperly, despite the fact that: (a) these same executives drove the Company into bankruptcy in June 2009 from which it did not emerge until February 2010; and (b) the Company's stock price fell from $33.56 per share at the time the Company emerged from bankruptcy to just $7.46 per share by the end of 2010 – a plummet of nearly *78%*. A majority of the Company's voting stockholders agree; they rejected the Board's business judgment by voting *against* the Board's recommended approval of the excessive 2010 executive compensation awards.

3.      Notably, the Company was previously known as, and was traded publicly beginning in 1998 as, the RH Donnelley Corporation ("RHD"). On December 31, 2008, the New York Stock Exchange (the "NYSE") suspended trading of RHD shares because the Company's market capitalization was less than $25 million for 30 consecutive trading days, in violation of the NYSE's continued listing standards. As a result of this suspension, the Company's stock began trading over-the-counter on the notorious "Pink Sheets" beginning on January 2, 2009 (under the symbol RHDC).

4.      In May 2009, the Company filed for bankruptcy under Chapter 11 of Title 11 of the U.S. Code. In February 2010, the Company emerged from bankruptcy as the "Dex One Corporation." Notably, some of the very same executives that drove the Company into bankruptcy remain employed with the Company and actually received increased 2010 executive compensation.

5.      On February 1, 2010, the NYSE started trading 50 million Dex shares under the "DEXO" ticker symbol. As of that date, the Company's stock traded for $33.56 per share. By the end of 2010, however, the Company's stock price had fallen nearly *78%*, to $7.46 per share. The Company's stock price has only continued to plummet since, and currently trades for about $1.25 per share -- a freefall of more than *96%* in just 18 months. In other words, it is 2008 and RHD all over again for Dex's unfortunate stockholders.

6.      Meanwhile, defendants, and in particular, the Board's Compensation Committee (the "Compensation Committee"), have represented publicly that the Board's executive compensation practices are firmly rooted in a "pay-for-performance" policy, and indeed, the Board reaffirmed that covenant for 2010 because it claimed that it was "paying for performance." For instance, in Dex's

most recent Proxy Statement filed with the Securities and Exchange Commission (the "SEC") and disseminated to Dex shareholders on March 17, 2011 (the "Proxy"), the Board represented that its executive compensation objectives are to *"align executive pay with performance, both annual and long-term."* Additionally, the Board stated that another objective is to *"strongly link the interests of executives to those of the Company's shareholders..."*

7.     Stated another way, the Company's executives should receive superior compensation only if they create "annual and long-term" performance for Dex stockholders, and they should receive less compensation when they do not. Despite its public statements, however, the Board did the exact opposite. Here, the Board and the Company's senior officers forced the Company into a bankruptcy which lasted into 2010, and delivered a 78% decline in the Company's stock price to shareholders in 2010 (as well as a 96% market loss since the rechristened Company emerged from bankruptcy), yet they nonetheless received increased 2010 compensation.

8.     Although the senior officers that brought the Company to the brink of ruin delivered abysmal performance, the Board nonetheless increased their executive compensation packages by nearly *300%* for 2010. This was pay for *underperformance* (or simply no performance), in direct violation of the Board's purported "pay for performance" policy and its own public statements, and it casts doubt upon the Board's loyalty and business judgment.

9.     Indeed, in addition to violating its own stated "pay for performance" policy, the Board's decision to increase executive compensation for 2010 demonstrates that their prior statements that they would pay for performance and reward "both annual and long-term performance" were false and misleading. This is particularly true considering that "annual performance" in 2010 included a Company stock price decline of about 78%, and "long-term performance" included the Company having to file for bankruptcy protection in 2009 and the suspension of public trading of its stock on the NYSE from December 2008 until February 2010. As alleged herein, Dex shareholders concluded (and rightfully so) that 2010 executive pay increases were not in their, or the Company's, best interests.

10.     Fortunately for Dex shareholders, for the first time in the Company's history, a "say on pay" vote was conducted via the Proxy, whereby Dex shareholders were afforded the chance to voice their dissatisfaction with the Board's clear disregard for their interests, the Board's own prior statements regarding its pay for performance compensation policy, and the Board's apparent refusal to acknowledge the Company's dreadful performance in determining executive compensation for 2010. In the Proxy, the Board unsurprisingly recommended that Dex shareholders should approve the Board's 2010 executive compensation program and the material pay increases, despite the fact that management had obviously not delivered any "annual" or "long-term" performance to shareholders whatsoever, much less both annual *and* long-term performance.

11.     On May 3, 2011, a majority (52%) of voting Dex stockholders *rejected* the Board's 2010 senior officer compensation recommendation. Clearly, Dex shareholders concluded that 2010 compensation increases were not in their best interests, and that the Board was not paying for performance.

12.     Unfortunately for Dex stockholders, however, despite the adverse shareholder vote (which occurred more than three months ago), the Board has not rescinded excessive 2010 executive compensation, *nor* has the Board indicated any intention to do so. In fact, the Board has remained entirely silent concerning the vote.

13.     The directors on the Board breached their fiduciary duties by materially increasing 2010 compensation in the immediate wake of: (a) the Company's bankruptcy; (b) the suspension of trading of the Company's stock on the NYSE; and (c) the plummet of the Company's stock price in 2010, despite claiming to adhere to a strict pay-for-performance policy which purportedly hinged upon "annual and long-term performance." The inference that the Board breached its fiduciary duties is supported by the facts that: (1) a majority of the Company's stockholders voted that the 2010 executive compensation was not in their best interests; and (2) the Board has failed to respond to the negative vote. By falsely claiming that the Board paid for performance and that the Company's executive officers would be rewarded for "annual and long-term performance,"

defendants also breached their fiduciary duties by issuing a series of materially misleading statements.

14.     For all of these reasons, the Board cannot now hide behind the so-called "business judgment rule," which is a summary judgment stage or trial stage defense, and which is only available to faithful fiduciaries. Based on the particularized facts alleged herein, plaintiff (and the majority of the Company's voting stockholders) has cast doubt on the Board's decision-making, as well as the accuracy and truthfulness of its public statements, and accordingly, this derivative action on behalf of the Company should proceed.

15.     By this shareholder derivative action, plaintiff seeks to recover damages and other relief on behalf of Dex against defendants for their breaches of fiduciary duties of candor, good faith, and loyalty, and for unjust enrichment. Absent this action, the majority will of the Company's stockholders shall be rendered meaningless, and the Company's rights against its wayward fiduciaries will not be exercised, to the further detriment of the Company.

### JURISDICTION AND VENUE

16.     This Court has jurisdiction over this action pursuant to 28 U.S.C. §1332(a)(2) in that Plaintiffs and defendants are citizens of different states and the matter in controversy exceeds $75,000.00, exclusive of interests and costs.

17.     This action is not a collusive one designed to confer jurisdiction on a court of the United States which it would not otherwise have.

18.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(a) because a substantial portion of the transactions and wrongs complained of herein, including defendants' participation in the wrongful acts detailed herein, occurred in this District and Dex maintains its corporate headquarters in this District. Further, defendants either reside in or maintain executive offices in this District, and/or have received substantial compensation in this District by engaging in numerous activities and conducting business here, which had an effect in this District.

## THE PARTIES

19.     Plaintiff Brad Haberland ("Plaintiff") is a shareholder of Dex and has been continuously throughout the Relevant Period. Plaintiff is a citizen of Wisconsin.

20.     Nominal defendant Dex is a Delaware corporation with its executives offices located at 1001 Winstead Drive, Cary, North Carolina 27513. According to its public filings, Dex "operates as a marketing solutions company."

21.     Defendant Jonathan B. Bulkeley ("Bulkeley") has served as a director of the Company since January 2010. Defendant Bulkeley served as Non-Executive Chairman of the Board from September 2010 until August 2011. Upon information and belief, defendant Bulkeley is a citizen of New York.

22.     Defendant Eugene I. Davis ("Davis") has served as a director of the Company since January 2010, and began serving as Non-Executive Chairman of the Board in August 2011. Upon information and belief, defendant Davis is a citizen of New Jersey.

23.     Defendant Richard L. Kuersteiner ("Kuersteiner") has served as a director of the Company since January 2010. In addition, defendant Kuersteiner has served as a member of the Compensation Committee during the Relevant Period. Upon information and belief, defendant Kuersteiner is a citizen of California.

24.     Defendant W. Kirk Liddell ("Liddell") has served as a director of the Company since January 2010. Upon information and belief, defendant Liddell is a citizen of Pennsylvania.

25.     Defendant Mark A. McEachen ("McEachen") has served as a director of the Company since January 2010. In addition, defendant McEachen has served as a member of the Compensation Committee during the Relevant Period. Upon information and belief, defendant McEachen is a citizen of California.

26.     Defendant Alfred T. Mockett ("Mockett") has served as a director of the Company and as its Chief Executive Officer ("CEO") since September 2010. Upon information and belief, defendant Mockett is a citizen of North Carolina.

27.     Defendant Alan F. Schultz ("Schultz") has served as a director of the Company since 2005, and previously served as Non-Executive Chairman of the Board from June 2010 to September 2010. Upon information and belief, defendant Schultz is a citizen of Michigan.

28.     Defendant Steven M. Blondy ("Blondy") served as the Company's Executive Vice President and Chief Financial Officer ("CFO") from January 2006 until he recently "resigned," effective July 31, 2011. Upon information and belief, defendant Blondy is a citizen of North Carolina.

29.     Defendant George F. Bednarz ("Bednarz") has served as the Company's Executive Vice President, Sales and Marketing since January 2011. Defendant Bednarz previously served as the Company's Executive Vice President, Enterprise Sales and Operations from June 2008 until January 2011. Upon information and belief, defendant Bednarz is a citizen of North Carolina.

30.     Defendant Mark W. Hianik ("Hianik") has served as the Company's Senior Vice President, General Counsel, and Corporate Secretary since April 2008. Upon information and belief, defendant Hianik is a citizen of North Carolina.

31.     Defendant Sean W. Greene ("Greene") has served as the Company's Senior Vice President, Interactive since July 2009. Upon information and belief, defendant Greene is a citizen of North Carolina.

32.     Defendant David C. Swanson ("Swanson") served as the Company's CEO from 2002 until May 2010. Upon information and belief, defendant Swanson is a citizen of North Carolina.

33.     Defendants Bulkeley, Davis, Kuersteiner, Liddell, McEachen, Mockett, Schultz, Blondy, Bednarz, Hianik, Greene, and Swanson shall be collectively referred to herein as "Defendants."

34.     Defendants McEachen, Kuersteiner, and Schultz shall be collectively referred to herein as the "Compensation Committee Defendants."

## THE DUTIES OF DEX'S DIRECTORS AND OFFICERS

35.     As directors and officers of Dex, the Defendants owed Dex and its shareholders an unremitting duty of loyalty that requires directors and officers to put the best interests of Dex's

shareholders ahead of their own personal interests and the interests of Dex's corporate managers. Directors who fail to act in shareholders' best interests breach their fiduciary duty of loyalty and may be held liable for damages. A claim for a breach of the duty of loyalty is, as a matter of law, non-exculpable.

36.     Because of their executive and directorial positions with Dex, the Defendants knew or should have known that by increasing 2010 executive compensation immediately following the Company's plunge into bankruptcy, the thirteen month long suspension of trading of the Company's stock on the NYSE, and the 78% decline in the Company's stock price in 2010 once it resumed trading on the NYSE, they were breaching their fiduciary duties of candor, good faith, loyalty and reasonableness owed to Dex, as well as unjustly enriching certain of the Company's senior officers. The Defendants also knew or should have known that by unanimously recommending shareholder approval of the 2010 executive compensation in the Proxy, they were breaching their fiduciary duty of candor and violating the Board's purported pay-for-performance executive compensation policy. There is doubt that those decisions were presumptively protected business judgments, and that the Board acted loyally in making these business judgments.

37.     Because of their executive and directorial positions with Dex, the Defendants also knew or should have known that the Proxy's (and other SEC filings') repeated representations that the Board only pays for performance were false and misleading. By causing such statements to be made, the Defendants were breaching their fiduciary duties of loyalty, good faith, candor and independence owed to Dex and its shareholders and these actions do not qualify for protection under the business judgment rule. The 2010 executive compensation increases were inconsistent with the Board's stated pay for performance policy and the Defendants' repeated statements to the contrary were designed to and did conceal the fact that the Board was overpaying the Company's executive officers via compensation plans premised on an illusory pay-for-performance policy.

38.     At times relevant hereto, the Defendants were the agents of each of the other Defendants and were at all times acting within the course and scope of such agency.

39. Pursuant to the Company's Compensation Committee charter, the Compensation Committee Defendants were specifically obligated, *inter alia*, to:

(a) Establish, administer, manage and periodically review all annual bonus, long-term incentive compensation, stock option, employee pension and welfare benefit plans;

(b) Monitor, on an on-going basis, such policies, plans and programs, and adopt or recommend amendments to or new policies, plans and programs, including all incentive compensation and equity-based plans; and

(c) Review and make individual compensation determinations, including but not limited to, salary, annual and long-term awards of cash and stock, stock option grants, other equity grants, with respect to the Company's CEO and senior management.

## AIDING AND ABETTING AND CONCERTED ACTION

40. In committing the wrongful acts particularized herein, the Defendants have pursued or joined in the pursuit of a common course of conduct, and have acted in concert with one another in furtherance of their common plan or design. In addition to the wrongful conduct particularized herein as giving rise to primary liability, the Defendants further aided and abetted and/or assisted each other in breach of their respective duties.

41. Each of the Defendants aided and abetted and rendered substantial assistance in the wrongs detailed herein. In taking such actions to substantially assist the commission of the wrongdoing detailed herein, each Defendant acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of his, her, or its overall contribution to and furtherance of the wrongdoing.

## FACTUAL ALLEGATIONS

42. According to its public filings, Dex "operates as a marketing solutions company." The Company offers various marketing solutions to promote businesses on the Internet, such as assessment of marketing programs and advertisements, message and image creation, recommendations for advertising placement, industry-specific research and information, market-

specific research and information, in-depth understanding of how consumers search for businesses and what influences them to buy from one business versus another.

43.    The Company's predecessor entity was founded in 1886. The Company was previously known as, and was traded publicly beginning in 1998 as, RHD. The mid and late 2000's, however, were not good for the Company (or its stockholders) as it struggled with a heavy $9.7 billion debt load attributable to a strategy of acquisitions between 2003 and 2007.

44.    On December 31, 2008, the NYSE suspended trading of RHD shares because the Company's market capitalization was less than $25 million for 30 consecutive trading days, in violation of the NYSE's continued listing standards. As a result of this suspension, the Company's stock began trading over-the-counter on the notorious "Pink Sheets"[1] beginning on January 2, 2009 under the symbol RHDC.

45.    The Company's move to the Pink Sheets was skywriting on the wall for investors because of that market's well-deserved reputation as the trading market of last resort, home to many fraudsters, and often, the last stop for a company on the road to bankruptcy.

46.    On May 28, 2009, the Company filed for bankruptcy under Chapter 11 of Title 11 of the U.S. Code. In February 2010, the Company emerged from bankruptcy as the "Dex One Corporation." Thus, the Company's name changed, but, as it would soon become clear, the song remained the same, as the rechristened Company would soon shed most of its new market capitalization.

47.    On February 1, 2010, the NYSE started trading 50 million Dex shares under the "DEXO" ticker symbol. The Company's stock price on that date was $33.56 per share. By

---

[1] OTC Markets Group, Inc., informally known as "Pink Sheets," is a private company that provides services to the U.S. over-the-counter securities market including electronic quotations, trading, messaging, and information platforms. Pink Sheets is not a stock exchange. To be quoted via Pink Sheets, companies do not need to fulfill any requirements (such as filing financial statements with the SEC), and accordingly, the SEC views stocks listed on Pink Sheets as "among the most risky investments." *See* http://www.sec.gov/answers/pink.htm.

December 31, 2010, however, the Company's stock price had plummeted nearly *78%*, to $7.46 per share.

48.     The Company's stock price has continued its freefall in 2011. As of the date of the filing of this Complaint, Dex stock is currently trading for about $1.25 per share, representing a decline of more than *96%* over the past 18 months -- "Groundhog Day"-type performance for the Company's stockholders.[2]

49.     Throughout the Relevant Period, the Board (and particularly, the Compensation Committee) overcompensated Dex's senior executives irrespective of the Company's actual performance, despite the Board's stated pay for performance policy, which purportedly hinged upon "annual and long-term" performance. The Board is directly responsible for the disconnect between management and stockholder interests. Specifically, for 2010, in the wake of the Company's bankruptcy, the thirteen month long suspension of public trading of its stock on the NYSE, and the 78% decline in the Company's stock price in 2010 after it resumed trading on the NYSE, the Board chose to handsomely reward the Company's executives with massive pay increases of up to almost *300%*.

50.     As detailed herein, in light of, *inter alia*, the Board's repeated "pay-for-performance" statements (including those in the Proxy), there is reason to doubt that: (a) the Board complied with its fiduciary duties; and/or (b) the Board's 2010 compensation decisions were protected business judgments. Plaintiff alleges that the Board's 2010 compensation decisions constituted a breach of their fiduciary duties of candor, good faith and loyalty, as well as causing the Defendants to be unjustly enriched.

---

[2] In the 1993 comedy film "Groundhog Day," the protagonist (portrayed by William James "Bill" Murray) is forced to relive the same day over and over again until he can learn to give up his selfishness and become a better person. In popular culture, the phrase "Groundhog Day" has since come to represent going through a phenomenon over and over until one spiritually transcends it. *See* "The Spiritual Power of Repetitive Form: Steps Toward Transcendence In Groundhog Day," Suzanne Daughton, *Critical Studies in Mass Communication*. Annandale: Jun 1996. Vol. 13, Iss. 2; p. 138.

**The Board's Purported "Pay-For-Performance" Policy**

51.     Defendants have represented publicly that the Board's executive compensation practices are firmly rooted in a "pay-for-performance" policy. For example, in the Proxy, the Board claimed that its executive compensation objectives are to "*align executive pay with performance, both annual and long-term.*" Additionally, the Board stated that another objective is to "*strongly link the interests of executives to those of the Company's shareholders...*"

52.     Stated obversely, the Company's executives should receive superior compensation only if they create "annual and long-term" performance for Dex stockholders, and they should receive less compensation when they do not. Despite its public statements, however, the Board did the exact opposite. Here, the Company's senior officers drove the Company to the brink of ruin and into a bankruptcy which lasted into 2010, caused the suspension of the public trading of the Company's stock on the NYSE from December 2008 until February 2010, and delivered a decline in the Company's stock price of nearly 78% once the Company's stock began trading on the NYSE again in February 2010, yet they received materially increased 2010 compensation.

**2010 Executive Compensation**

53.     For 2010, Dex's five highest-paid Section 16 executive officers -- defendants Blondy, Bednarz, Hianik, Greene, and Swanson -- collectively received *nearly $17.4 million* in executive compensation, as detailed below:

| Name | Salary and Bonus ($) | Non-Equity Incentive Plan Compensation ($) | Option Awards ($) | Total Compensation ($)[3] |
|---|---|---|---|---|
| Blondy | 1,876,923 | 246,338 | 1,359,180 | 3,661,288 |
| Bednarz | 1,401,539 | 179,070 | 988,500 | 2,865,698 |
| Hianik | 861,539 | 162,456 | 454,712 | 1,578,235 |
| Greene | 613,553 | 108,389 | 407,763 | 1,244,537 |
| Swanson | 3,966,923 | 283,854 | 3,445,648 | 8,020,297 |

[3] Total Compensation includes the following: Salary, Bonus, Stock Awards, Non-Equity Incentive Plan Compensation, and All Other Compensation (as defined in the Proxy).

| Total | | | | $17.370.055 |
| --- | --- | --- | --- | --- |

54.     As discussed above, despite the facts that the Board claimed it based executive pay on *both annual and long-term* performance, that the Company had plunged into a bankruptcy from which it did not emerge until February 2010, that its stock had been suspended from public trading by the NYSE for thirteen months, and that the Company's stock price fell by about 78% in 2010 once it resumed trading in 2010, defendants Blondy, Bednarz, Hianik, Greene, and Swanson each received materially increased compensation from 2009.

55.     Specifically, defendants Blondy, Bednarz, Hianik, Greene, and Swanson received the following percentage increases in their 2010 executive compensation: Blondy: 297.7%, Bednarz: 238.1%, Hianik: 148.5%, Greene: 103%, and Swanson: 1.6%.[4]

**A Majority of Dex's Shareholders Reject the Board's Business Judgment**

56.     Fortunately for the Company's shareholders, on March 17, 2011, for the first time in the Company's history, a "say on pay" vote was conducted via the Proxy, whereby Dex shareholders were given the chance to voice their dissatisfaction with the Board's clear disregard for their interests, the Board's own prior statements regarding its pay for performance compensation policy, and the Board's apparent refusal to acknowledge the Company's dreadful performance in determining executive compensation for 2010. The Company's stockholders were finally afforded the opportunity to vote on whether, as the Board claimed, the interests of Dex's executive officers' interests were in fact aligned with those of long-term shareholders.

57.     Prior to the Company's first say on pay vote, the Board issued the Proxy, wherein it "recommended" to Dex shareholders that they should approve Dex's 2010 executive compensation, stating:

---

[4] Notably, defendants Blondy and Bednarz also each received materially higher compensation for 2010 than they did for 2008, *prior* to driving the Company into its 2009 bankruptcy. For instance, in 2010, defendants Blondy and Bednarz received 74.5% and 71.3% higher compensation (respectively) than they did in 2008.

"RESOLVED, that the stockholders approve, on an advisory basis, the compensation of the named executive officers, as disclosed in the Company's Proxy Statement for the 2011 Annual Meeting of Stockholders pursuant to the compensation disclosure rules of the Securities and Exchange Commission, including the Compensation Discussion and Analysis, the Summary Compensation Table and the other related tables and disclosure."

This vote is advisory, and therefore not binding on Dex One, the Board or the Compensation and Benefits Committee. *The Board and the Compensation and Benefits Committee values the opinions of our stockholders and, to the extent there is any significant vote against the NEO compensation as disclosed in this proxy statement, we will consider such stockholders' concerns and the Compensation and Benefits Committee will evaluate whether any actions are necessary to address those concerns.*

OUR BOARD OF DIRECTORS UNANIMOUSLY RECOMMENDS A VOTE "FOR" THE ADVISORY (NON-BINDING) VOTE APPROVING EXECUTIVE COMPENSATION

58.     Notably, the Board also claimed in the Proxy that it would "consider…stockholders' concerns" in the event of "any significant vote against the NEO compensation as disclosed in this proxy statement."

59.     In July 2010, the Dodd-Frank Wall Street Reform and Consumer Protection Act (the "Dodd-Frank Act") was enacted to require certain public companies to submit executive compensation plans to a shareholder vote, widely known as a "say on pay" vote. *See e.g.* 15 U.S.C. Section 78n-1.[5] Congress intended Dodd-Frank's say-on-pay vote to function as a referendum on whether the executive compensation awarded was in the best interests of shareholders. *See* S. Rep. No. 111-176, at 133 (2010) ("shareowner votes on pay [were meant to] serve as a direct referendum on the decisions of the compensation committee and [] offer a more targeted way to signal shareowner discontent than withholding votes from committee members."). Indeed, according to a

---

[5] Title IX of the Dodd-Frank Act, known as the Investor Protection and Securities Reform Act of 2010, contains the "say-on-pay" provisions at Subtitle E (Accountability and Executive Compensation), Section 951, requiring, among other things, that "[n]ot less frequently than once every 3 years, a proxy or consent or authorization for an annual or other meeting of the shareholders for which the proxy solicitation rules of the Commission require compensation disclosure shall include a separate resolution subject to shareholder vote to approve the compensation of executives . . ."

Senate Banking Report, the purpose of the Dodd-Frank Act's say-on-pay vote is to provide an efficient means for shareholders, as the owners of a corporation, to collectively express whether the corporation's executive compensation is in their best interests as shareholders. *See* S. Rep. No. 111-76, at 133.

60. In their relatively short history, negative "say on pay" votes on executive compensation have been extremely rare. For instance, between March 2010 and March 2011, out of 101 companies with say-on-pay voting, only two companies had negative votes rejecting the proposed pay: Jacobs Engineering Group, Inc. and Beazer Homes USA, Inc. *See* www.pionline.com/article/20110315/DAILYREG/110319948.[6] Accordingly, during the first year of "say on pay" votes under the Dodd-Frank Act, voting shareholders overwhelmingly endorsed companies' pay programs, providing 91.2% support on average. *See* June 28, 2011 article entitled "U.S. Proxy Season Review: 'Say on Pay' Votes" available at http://blog.riskmetrics.com (the "June 28 Risk Metrics Article").

61. This support exceeded the 89.2% average shareholder approval in 2010, when "say on pay" votes were mandated only at U.S. government-supported financial firms. For 2011, as of June 28, 2011, shareholders had rejected compensation proposals in say on pay votes at only 37 companies, or just *1.7%* of the more than 2,200 companies in the Russell 3000 index that have reported vote results. The June 28 Risk Metrics Article also stated:

> So far this season, S&P 500 companies have averaged 88.6 percent support, which is slightly less than the 91.8 percent approval for issuers in the Russell 3000 index, according to ISS data as of June 14. At the sector level, large-cap industrial companies had the lowest average support of 87.1 percent, while large consumer retail firms received the highest approval at 90.7 percent. Large financial firms, which traditionally have received more scrutiny over pay, had the second-highest approval average of 89.7 percent. Within the Russell 3000 index, the energy sector

---

[6] In the prior year's proxy season (the 2010 proxy season), over 600 companies held say-on-pay votes, and only three of those companies failed to obtain shareholder approval: KeyCorp, Motorola, Inc., and Occidental Petroleum Corp. *See* http://josephandcohen.com/2010/06/joseph-law-newsbrief-%e2%80%9csay-on-pay%e2%80%9d-lessons-from-keycorp%e2%80%99s-2010-%e2%80%9cno-on-pay%e2%80%9d-vote/.

received the lowest level of average support (88.8 percent), while consumer retail firms again received the highest average approval (92.8 percent).

62. Thus, shareholders have almost uniformly supported companies' pay programs, and they have done so by overwhelming margins. Indeed, of the 1,873 companies that had reported voting results as of May 27, 2011, more than two-thirds of those companies received 90% support or more from their voting shareholders.

63. Dex shareholders, however, have notably expressed their disapproval of the Board's 2010 compensation decisions. On May 3, 2011, a majority of Dex's voting shareholders resoundingly *rejected* the Board's business judgment and its 2010 executive compensation decision.

64. As the Defendants subsequently reported in a Form 8-K filed with the SEC on May 6, 2011, the say-on-pay vote resulted in 19,467,333 votes against the 2010 executive compensation recommended by the Board, 17,962,834 votes in favor of the Board's recommendation, and 11,705 abstentions. Notably, the Board's recommendation was rejected by 52% of Dex's voting stockholders, even though, upon information and belief, there was no "formal," organized institutional opposition to the Board's executive pay recommendation.

65. Critically, despite claiming that they would "consider stockholders' concerns" in the event of a negative vote, upon information and belief, the Board has done absolutely nothing in response to the negative vote, which is in itself a breach of fiduciary duty.

66. The directors on the Board breached their fiduciary duties by materially increasing 2010 executive compensation in the immediate wake of a Company bankruptcy and a thirteen month suspension of the public trading of its stock, after claiming to adhere to a strict pay-for-performance policy based on "both annual and long-term" performance. The inference that the Board breached its fiduciary duties is supported by the facts that: (1) a majority of the Company's stockholders voted that 2010 executive compensation was not in their best interests; and (2) the Board has failed to respond to the negative vote. By falsely claiming that the Board paid for performance and that the Company's executive officers would be rewarded for delivering "annual and long-term

performance," the Board also breached its fiduciary duties by issuing a series of materially misleading statements.

67.     Thus, there is reason to doubt that the Board's actions and public representations were taken or made loyally, and/or in good faith, and/or are entitled to the presumptive protections of the business judgment rule.

## DAMAGES TO DEX

68.     Dex has been damaged by the Board's awards of unwarranted, outsized executive compensation.  During 2010, the Company's stock price fell by nearly 78%; yet, incredibly, executive compensation for senior officers increased by as much as nearly *300%*, in direct violation of the Board's purported "pay for performance" compensation policy.

69.     When for the first time given the opportunity to offer their own independent judgment of the Board's award of 2010 executive compensation, a majority of Dex's voting shareholders firmly rejected the 2010 executive compensation (and rightfully so).

70.     By this derivative action, Plaintiff seeks to recover damages and other relief for Dex against Defendants for their breaches of fiduciary duties of candor, good faith and loyalty, and for unjust enrichment.  Absent this action, as the Board has already amply demonstrated, the majority will of the Company's stockholders shall be rendered meaningless and the Company's rights against its wayward fiduciaries will not be exercised to the further detriment of the Company.

## DERIVATIVE AND DEMAND ALLEGATIONS

71.     Plaintiff incorporates the above-referenced paragraphs as if fully set forth herein.

72.     Plaintiff brings this action derivatively on behalf of Dex to redress injuries suffered, and yet to be suffered, by the Company as a direct and proximate result of Defendants' misconduct.  Plaintiff is a current holder of Dex common stock and will adequately represent the interests of the Company in this litigation.  Plaintiff has retained counsel experienced in litigating this type of action.

73.     The Board is currently comprised of the following seven (7) directors: defendants Bulkeley, Davis, Kuersteiner, Liddell, McEachen, Mockett, and Schultz.

74.     There is doubt that the Board's decision to increase 2010 executive compensation was a protected business judgment, which excuses demand. The Board claimed that its executive compensation practices aligned management/stockholder interests because it paid-for-performance and the policy "align[ed] executive pay with performance, both annual and long-term." Therefore, executives should only receive superior compensation if "both annual and long-term" performance was delivered to Dex and Dex stockholders. Clearly, given that the Company plunged into bankruptcy in 2009 from which it did not emerge until 2010, that trading of the Company's stock on the NYSE was suspended for thirteen months between December 2008 and February 2010, and that the Company's stock price fell by about 78% once it resumed trading on the NYSE in 2010, these executives have neither delivered "annual" nor "long-term" performance to Dex shareholders (much less both). Based on these representations (among others), a majority of the Company's stockholders rejected the Board's 2010 executive compensation recommendation. These undisputed facts raise doubt that the Board's 2010 compensation decision was a protected business judgment. Thus, demand is excused.

75.     A majority of the Board is interested in a demand because there is substantial likelihood that they will be held liable for their conduct. The Board claimed that its executive compensation practices aligned management/stockholder interests because it paid-for-performance and the policy "align[ed] executive pay with performance, both annual and long-term." Therefore, executives should only receive superior compensation if "both annual and long-term" performance was delivered to Dex and Dex stockholders. Clearly, given that the Company plunged into bankruptcy in 2009 from which it did not emerge until 2010, that trading of the Company's stock on the NYSE was suspended for thirteen months between December 2008 and February 2010, and that the Company's stock price fell by about 78% once it resumed trading on the NYSE in 2010, these executives have neither delivered "annual" nor "long-term" performance to Dex shareholders (much less both). These undisputed facts raise doubt that a majority of the Board complied with their fiduciary duties of loyalty and good faith. Thus, demand is excused.

76.     There is doubt that the Board's decision to issue false and misleading statements regarding its purported "pay-for-performance" policy was a protected business judgment, which excuses demand.    The Board claimed that its executive compensation practices aligned management/stockholder interests because it paid-for-performance and the policy "align[ed] executive pay with performance, both annual and long-term." Therefore, executives should only receive superior compensation if "both annual and long-term" performance was delivered to Dex and Dex stockholders. Clearly, given that the Company plunged into bankruptcy in 2009 from which it did not emerge until 2010, that trading of the Company's stock on the NYSE was suspended for thirteen months between December 2008 and February 2010, and that the Company's stock price fell by about 78% once it resumed trading on the NYSE in 2010, these executives have neither delivered "annual" nor "long-term" performance to Dex shareholders (much less both). The Board's false and misleading statements raise doubt that they are entitled to the protections of the business judgment rule. Thus, demand is excused.

77.     A majority of the Board is interested in a demand because there is substantial likelihood that they will be held liable for their conduct.  The Board claimed that its executive compensation practices aligned management/stockholder interests because it paid-for-performance and the policy "align[ed] executive pay with performance, both annual and long-term." Therefore, executives should only receive superior compensation if "both annual and long-term" performance was delivered to Dex and Dex stockholders.  Clearly, given that the Company plunged into bankruptcy in 2009 from which it did not emerge until 2010, that trading of the Company's stock on the NYSE was suspended for thirteen months between December 2008 and February 2010, and that the Company's stock price fell by about 78% once it resumed trading on the NYSE in 2010, these executives have neither delivered "annual" nor "long-term" performance to Dex shareholders (much less both).  Accordingly, the Board's false and misleading statements raise doubt that the entire Board complied with their fiduciary duties of loyalty and good faith.  Because the entire Board faces a substantial likelihood of liability in connection with the issuance of false and misleading statements, demand is excused.

78.     Pre-suit demand on defendant Mockett is excused because his principal professional occupation is his employment as CEO and President of Dex. Accordingly, Mockett has received and continues to receive substantial monetary compensation and other valuable benefits (including the excessive compensation complained of herein).  In addition, Defendants have admitted in the Proxy that Mockett is not independent. Thus, Mockett lacks independence, rendering him incapable of impartially considering a demand to commence and vigorously prosecute this action.

79.     Defendants McEachen, Kuersteiner, and Schultz are each interested in a demand as a result of their conduct on the Compensation Committee.  Pursuant to the Company's Compensation Committee Charter, directors on the Compensation Committee are responsible for, inter alia, reviewing and setting executive compensation in conformity with the Board's pay for performance policy. Defendants McEachen, Kuersteiner, and Schultz breached their fiduciary duties of due care, loyalty, and good faith, because the Compensation Committee, inter alia, awarded the above-discussed 2010 executive compensation, which was wholly divorced from the Company's performance criteria.  Therefore, defendants McEachen, Kuersteiner, and Schultz (if not the entire Board) each face a substantial likelihood of liability for their breach of fiduciary duties and any demand upon them is futile.

80.     There is doubt that the Board's decision to ignore the negative say on pay vote by Dex shareholders was a protected business judgment, which excuses demand.  In particular, the members of the Board claimed that they would "consider…stockholders' concerns" in the event of "any significant vote against the NEO compensation as disclosed in this proxy statement." Despite this representation, even after Dex shareholders issued a negative say on pay vote, the Board has done absolutely nothing, including issuing a response to shareholders.  There is doubt that this decision was a protected business judgment.  Thus, demand is excused.

81.     A pre-suit demand is further excused because a majority of the Board either was at fault for the misconduct described herein and/or is liable for the misconduct described herein.  As

such, the Board members are disabled as a matter of law from objectively considering any pre-suit demand, rendering demand futile and excused.

## FIRST CAUSE OF ACTION
### Against the Defendants for Breach of Fiduciary Duty in Connection For the Issuance of False and Misleading Statements

82.     Plaintiff incorporates the above-referenced paragraphs as if fully set forth herein.

83.     Each of the Defendants was a director and/or officer of Dex and as such owed to Dex the highest duty known to the law. Each of the Defendants agreed to and did participate in and/or aided and abetted one another in a deliberate course of action designed to divert corporate assets in breach of the fiduciary duties these Defendants owed to Dex.

84.     As demonstrated by the allegations above, the Defendants breached their fiduciary duties of loyalty, good faith, candor and independence owed to Dex and its shareholders, and failed to disclose material information and/or made material misrepresentations to shareholders regarding Dex's 2010 executive compensation scheme.

85.     The Defendants have violated fiduciary duties of care, loyalty, good faith, candor and independence owed to Dex and its shareholders, have engaged in unlawful self-dealing and have acted to put their personal interests and/or their colleagues' interests ahead of the interests of Dex and its shareholders. As directors and/or officers of Dex, the Defendants participated in the wrongful acts alleged herein. They thereby breached their fiduciary duties to Dex's shareholders.

86.     As corporate fiduciaries, the Defendants owed Dex and its shareholders a duty of candor and full and accurate disclosure. As a result of the conduct complained of, the Defendants made, or aided and abetted the making of, numerous misrepresentations to and/or concealed material facts from Dex's shareholders despite their duties to, *inter alia*, disclose the true facts regarding Dex. Thus they have violated their duty of candor.

87.     In committing the wrongful acts particularized herein, the Defendants have pursued or joined in the pursuit of a common course of conduct, and have acted in concert with one another in furtherance of their common plan or design.

88.     At all relevant times, the Defendants collectively and individually initiated a course of conduct which was designed to and did: (i) conceal the fact that the Company was overpaying its directors, officers and employees via compensation plans premised on an illusory "pay for performance" executive compensation scheme; and (ii) maintain their directorial and executive positions at Dex and the profits, power and prestige which they enjoyed as a result of these positions.

89.     In particular, in the Proxy, the Board stated that their pay for performance policy "align[ed] executive pay with performance, both annual and long-term." Additionally, the Board stated that another "objective" is to *strongly link the interests of executives to those of the Company's shareholders...*" Despite this (and other) representations, even though the Company just emerged from bankruptcy and trading in its stock was suspended by the NYSE for thirteen months, and then its stock price plummeted by nearly 78% once it resumed trading on the NYSE in 2010, the Board still increased executive compensation, in direct contravention of their previously stated "pay-for-performance" policy. Accordingly, it is clear that the Board's repeated statements that it pays for performance were false and misleading.

90.     The Defendants' misconduct was not due to an honest error of judgment, but rather their bad faith and was done knowingly, willfully, intentionally or recklessly.

91.     By reason of the foregoing acts, practices and course of conduct, the Defendants have failed to exercise good faith and instead have acted knowingly or in reckless disregard of their fiduciary obligations toward Dex and its public shareholders, harming Dex.

## SECOND CAUSE OF ACTION
### Against the Defendants for Breach of Fiduciary Duty in Connection with the Board's Compensation Practices

92.     Plaintiff incorporates the above-referenced paragraphs as if fully set forth herein.

93.     Each of the Defendants was a director and/or officer of Dex and as such owed to Dex the highest duty known to the law. Each of the Defendants agreed to and did participate in and/or aided and abetted one another in a deliberate course of action designed to divert corporate assets in breach of the fiduciary duties these Defendants owed to Dex.

94.    As demonstrated by the allegations above, the Defendants breached their fiduciary duties of loyalty, good faith, candor and independence owed to Dex and its shareholders by failing to adhere to the Company's purported pay-for-performance policy.  In particular, in the Proxy, the Board stated that their pay for performance policy "align[ed] executive pay with performance, both annual and long-term."  Additionally, the Board stated that another "objective" *is to "strongly link the interests of executives to those of the Company's shareholders*..."  Despite this (and other) representations, even though the Company just emerged from bankruptcy and trading in its stock was suspended by the NYSE for thirteen months, and then its stock price plummeted by nearly 78% once it resumed trading on the NYSE in 2010, the Board still increased executive compensation, in direct contravention of their previously stated "pay-for-performance" policy.    This increase in executive compensation in direct contravention of the Board's stated pay for performance policy was a breach of the Board's fiduciary duties.

95.    The Defendants have violated fiduciary duties of care, loyalty, good faith, candor and independence owed to Dex and its shareholders, have engaged in unlawful self-dealing, and have acted to put their personal interests and/or their colleagues' interests ahead of the interests of Dex and its shareholders.  As directors and/or officers of Dex, the Defendants participated in the wrongful acts alleged herein.  They thereby breached their fiduciary duties to Dex's shareholders.

96.    In committing the wrongful acts particularized herein, the Defendants have pursued or joined in the pursuit of a common course of conduct, and have acted in concert with one another in furtherance of their common plan or design.

97.    The Defendants' misconduct was not due to an honest error of judgment, but rather their bad faith and was done knowingly, willfully, intentionally or recklessly.

98.    By reason of the foregoing acts, practices and course of conduct, the Defendants have failed to exercise good faith and instead have acted knowingly or in reckless disregard of their fiduciary obligations toward Dex and its public shareholders, harming Dex.

## THIRD CAUSE OF ACTION
### Against the Defendants for Breach of Fiduciary Duty in Connection with the Failure to Respond to the Negative Say on Pay Vote

99.     Plaintiff incorporates the above-referenced paragraphs as if fully set forth herein.

100.    Each of the Defendants was a director and/or officer of Dex and as such owed to Dex the highest duty known to the law. Each of the Defendants agreed to and did participate in and/or aided and abetted one another in a deliberate course of action designed to divert corporate assets in breach of the fiduciary duties these Defendants owed to Dex.

101.    As demonstrated by the allegations above, the Defendants breached their fiduciary duties of loyalty, good faith, candor and independence owed to Dex and its shareholders by failing to amend or alter 2010 executive compensation (or even issue a response) in connection with the negative say on pay vote. In particular, despite having their executive compensation program rejected by a majority of voting shareholders, the Board has done nothing in response, in direct violations of their fiduciary duties.

102.    The Defendants have violated fiduciary duties of care, loyalty, good faith, candor and independence owed to Dex and its shareholders, have engaged in unlawful self-dealing and have acted to put their personal interests and/or their colleagues' interests ahead of the interests of Dex and its shareholders. As directors and/or officers of Dex, the Defendants participated in the wrongful acts alleged herein. They thereby breached their fiduciary duties to Dex's shareholders.

103.    In committing the wrongful acts particularized herein, the Defendants have pursued or joined in the pursuit of a common course of conduct, and have acted in concert with one another in furtherance of their common plan or design.

104.    The Defendants' misconduct was not due to an honest error of judgment, but rather their bad faith and was done knowingly, willfully, intentionally or recklessly.

105.    By reason of the foregoing acts, practices and course of conduct, the Defendants have failed to exercise good faith and instead have acted knowingly or in reckless disregard of their fiduciary obligations toward Dex and its public shareholders, harming Dex.

## FOURTH CAUSE OF ACTION
### Against the Defendants for Unjust Enrichment

106. Plaintiff incorporates the above-referenced paragraphs as if fully set forth herein.

107. As a result of the conduct described above, the Defendants will be and have been unjustly enriched at the expense of Dex, in the form of unjustified salaries, benefits, stock option grants and other emoluments of office.

108. All the payments and benefits provided to the Defendants based upon or related to Defendants' executive compensation scheme were unjustly awarded and at the expense of Dex, resulting in substantially unearned benefits.

109. The Defendants should be ordered to disgorge the gains which they have and/or will unjustly obtain and/or a constructive trust should be imposed for the benefit of the Company.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A. Against Defendants and in favor of Dex for the amount of damages sustained by the Company as a result of Defendants' violation of state law;

B. Extraordinary equitable and/or injunctive relief as necessary or permitted by law, equity and the statutory provisions sued hereunder, including disgorgement, attachment, impoundment, imposition of a constructive trust on or otherwise restricting the disposition/exercise of improvidently awarded executive compensation based upon false financial reporting and/or the proceeds of Defendants' trading activities or their other assets so as to ensure that Plaintiff on behalf of Dex has an effective remedy;

C. Ordering the implementation and administration of internal controls and systems at Dex designed to prohibit and prevent excessive and/or unwarranted executive compensation payments to Dex's senior executives;

D. Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, and accountants' and experts' fees, costs, and expenses; and

E. Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

Dated:  September 1, 2011

ESSEX RICHARDS, P.A.

/s/ EDWARD G. CONNETTE
N.C. State Bar No. 9172

/s/ MARC E. GUSTAFSON
N.C. State Bar No. 34429

1701 South Boulevard
Charlotte, NC 28203
Telephone:  (704) 377-4300
Facsimile:  (704) 372-1357
econnette@essexrichards.com
mgustafson@essexrichards.com
Counsel for Plaintiff and
Local Rule 83.1 Counsel

THE WEISER LAW FIRM, P.C.
ROBERT B. WEISER
BRETT D. STECKER
JEFFREY J. CIARLANTO
JOSEPH M. PROFY
121 N. Wayne Avenue, Suite 100
Wayne, PA 19087
Telephone:  (610) 225-2677
Facsimile:  (610) 225-2678
Counsel for Plaintiff*

*Not yet admitted Pro Hac Vice

## DEX ONE CORP. VERIFICATION

I, Brad Haberland, hereby verify that I am familiar with the allegations in the Complaint, and that I have authorized the filing of the Complaint, and that the foregoing is true and correct to the best of my knowledge, information, and belief.

Date: 8/19/2011

Brad Haberland
Brad Haberland