IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
No. 5:11-CV-463-D

BRAD HABERLAND, derivatively          )
on behalf of Dex One Corporation,     )
                                      )
                 Plaintiff,           )
                                      )
        v.                            )          **ORDER**
                                      )
JONATHAN B. BULKELEY, et al.,         )
                                      )
                 Defendants.          )

On September 1, 2011, Brad Haberland ("Haberland" or "plaintiff") filed this action derivatively on behalf of Dex One Corporation ("Dex One"). Compl. [D.E. 1]. Haberland's complaint alleges breaches of fiduciary duties and unjust enrichment allegedly committed by Jonathan B. Bulkeley ("Bulkeley"), Eugene I. Davis ("Davis"), Richard L. Kuersteiner ("Kuersteiner"), W. Kirk Liddell ("Liddell"), Mark A. McEachen ("McEachen"), Alfred T. Mockett ("Mockett"), Alan F. Schultz ("Schultz"), Steven M. Blondy ("Blondy"), George F. Bednarz ("Bednarz"), Mark W. Hianik ("Hianik"), Sean W. Greene ("Greene"), and David C. Swanson ("Swanson") (collectively, "defendants"). See id. ¶¶ 21–32, 82–109; Am. Compl. [D.E. 47-2] ¶¶ 23–34, 88–124. On October 31, 2011, defendants moved to dismiss the complaint. Defs.' Mot. Dismiss [D.E. 25]. On December 23, 2011, Haberland responded in opposition to defendants' motion to dismiss. Pl.'s Mem. Opp'n Mot. Dismiss [D.E. 32]. On January 20, 2012, defendants replied. Defs.' Reply [D.E. 34]. On March 27, 2012, Haberland filed an amended complaint [D.E. 35]. On April 4, 2012, defendants moved to strike the amended complaint. Defs.' Mot. Strike [D.E. 44]. The following day, Haberland moved for leave to amend the complaint. Pl.'s Mot. Leave [D.E. 47]. On April 26, 2012, defendants filed a memorandum in opposition to Haberland's motion for leave to amend his complaint [D.E. 54]. As explained below, the court grants Haberland's motion

for leave to amend his complaint, and grants defendants' motion to dismiss.

I.

Dex One is a "marketing solutions company" incorporated under Delaware law and headquartered in Cary, North Carolina. Am. Compl. ¶¶ 22, 44 (quotation omitted). In the mid- to late-2000s, Dex One's predecessor company, RHD, experienced financial difficulties. Id. ¶ 45. As a result of a loss of market capitalization, on December 31, 2008, the New York Stock Exchange suspended trading of RHD's shares. Id. ¶ 46. On May 28, 2009, RHD filed for Chapter 11 bankruptcy. Id. ¶ 48. On January 29, 2010, RHD emerged from Chapter 11 bankruptcy as Dex One. 2011 Proxy Statement [D.E. 29-4, 29-5] 5; see Am. Compl. ¶¶ 48–49.[1] On February 1, 2010, the New York Stock Exchange began trading Dex One stock at $33.56 per share. Am. Compl. ¶ 49. By December 31, 2010, Dex One's share price had fallen to $7.46, a 78 percent decline. Id.

Defendants were either directors or executive officers of Dex One during all or part of 2009 and 2010. Bulkeley, Davis, Kuersteiner, Liddell, McEachen, Mockett, and Schultz comprised Dex One's board of directors ("Board"). See id. ¶¶ 23–29; 2011 Proxy Statement 10–12. Mockett also served as Dex One's president and chief executive officer ("CEO") beginning in September 2010. Am. Compl. ¶ 28. Blondy, Bednarz, Hianik, Greene, and Swanson were other Dex One executive officers. Id. ¶¶ 30–34. Blondy served as Dex One's executive vice president and chief financial officer from January 2006 until July 31, 2011. Id. ¶ 30. Bednarz served as Dex One's executive vice president for enterprise sales and operations from June 2008 until January 2011, and as Dex One's executive vice president for sales and marketing from January 2011 until March 31, 2011. Id. ¶ 31. At various times since April 2008, Hianik has served as Dex One's senior vice president, general counsel, chief administrative officer, and corporate secretary. Id. ¶ 32. Greene served as Dex One's

---

[1] Haberland alleges that Dex One emerged from Chapter 11 bankruptcy in February 2010. See Am. Compl. ¶ 48. Haberland confuses the date on which Dex One emerged from Chapter 11 bankruptcy and the date on which the New York Stock Exchange began trading Dex One shares.

senior vice president for interactive from July 2009 until March 31, 2011. Id. ¶ 33. Finally, Swanson served as Dex One's CEO from 2002 until May 2010. Id. ¶ 34.

Dex One's Board "is responsible for overseeing the affairs of the Company." 2011 Proxy Statement 5. "The Board maintains three standing committees—an Audit and Finance Committee, a Compensation and Benefits Committee[,] and a Corporate Governance Committee." Id. The Board has delegated certain authority to each committee. See id. Most importantly here, the Compensation and Benefits Committee, a three-member committee that at all relevant times consisted of Kuersteiner, McEachen, and Schultz, see id. 11–12; Am. Compl. ¶ 36, establishes and administers certain compensation practices for Dex One. Specifically, "[t]he Compensation and Benefits Committee is responsible for the oversight of [Dex One's] executive and non-management director compensation practices and programs and the administration of [Dex One's] compensation and benefits plans for employees (including senior management) and non-management directors." 2011 Proxy Statement 6. That committee is also "responsible for reviewing and approving all aspects of the compensation paid to" Dex One's executive officers. Id.

The Compensation and Benefits Committee determines the compensation for Dex One's executive officers based on the compensation plan the committee develops for a given year. See id. 13–14. For all executive officers except the CEO, the Compensation and Benefits Committee exercises final authority on compensation packages. See id. For Dex One's CEO, the Compensation and Benefits Committee recommends to the Board a compensation package, which the independent directors of the full Board must review and approve. Id. 14. The Compensation and Benefits Committee uses the same compensation plan to determine the compensation due to (or to be recommended for) each executive officer. See id. 15–32, 35–36. Here, the Compensation and Benefits Committee determined Blondy's, Bednarz's, Hianik's, Greene's, and Swanson's 2010 compensation, and recommended Mockett's 2010 compensation, based on a specifically designed plan for 2010 ("2010 Executive Compensation Plan").

3

The 2010 Executive Compensation Plan was designed to achieve six objectives: (1) to "enable the Company to attract and retain the key leadership talent required to successfully execute its business strategy"; (2) to "align executive pay with performance, both annual and long-term"; (3) to "ensure internal equity, both as compared to other executives based upon position and contributions, and to the broader employee population"; (4) to "strongly link the interests of executives to those of the Company's shareholders and other key constituencies"; (5) to "keep the executive compensation practices transparent, in line with best practices in corporate governance"; and (6) to "administer executive compensation on a cost-effective and tax-efficient basis." Id. 13. "Consistent with the [six] principles of Dex One's executive officer compensation . . . , [Mockett's, Blondy's, Bednarz's, Hianik's, Greene's, and Swanson's] total direct compensation [was] based upon" base salary, annual incentive compensation, and long-term incentive compensation. Id. 15–16.

For 2010, Mockett's, Blondy's, Bednarz's, Hianik's, Greene's, and Swanson's base salary was non-performance based, was established "to compensate them for services rendered during the year, and [was] essential for the attraction and retention of [those] talented executive officers." Id. 16. The Compensation and Benefits Committee established Blondy's, Bednarz's, Hianik's, Greene's, and Swanson's 2010 base salary in February 2010. Id. Because Dex One did not hire Mockett as CEO until September 2010, the Compensation and Benefits Committee did not recommend his 2010 base salary until that month. Id.

Annual incentive compensation represented an "opportunity [for Mockett, Blondy, Bednarz, Hianik, Greene, and Swanson] to earn variable cash compensation . . . ." Id. In other words, annual incentive compensation was performance-based. In February 2010, the Compensation and Benefits Committee established the components and target performance levels that determined the 2010 annual incentive compensation for Blondy, Bednarz, Hianik, Greene, and Swanson, as well as their relative weights. See id. 16–17. In September 2010, the Compensation and Benefits Committee did

4

the same for Mockett. See id. For purposes of the 2010 annual incentive compensation owed to each executive, Mockett's, Blondy's, Bednarz's, Hianik's, Greene's, and Swanson's performance was measured by four metrics: (1) ad sales growth, (2) earnings before interest, taxes, depreciation, and amortization ("EBITDA"), (3) free cash flow, "defined as cash flow from operations, less capital expenditures adjusted for cash restructuring payments and cash reorganization payments," and (4) line of sight, a performance metric designed to capture "specific strategic initiatives and . . . additional critical factors specific to the executive's role," including, for instance, "customer growth, increased consumer usage, increased digital sales, improved employee engagement scores[,] and achievement of individual departmental budgets." Id. 17. In March 2011, the Compensation and Benefits Committee determined the amount of annual incentive compensation due to Blondy, Bednarz, Hianik, Greene, and Swanson for 2010, and recommended the amount Mockett should receive for 2010. See id.

Unlike annual incentive compensation, long-term incentive compensation was only partly performance-based. See id. 18 (providing that long-term incentive compensation "provide[d] . . . executive officers with the opportunity to earn variable long-term equity and/or cash compensation under . . . various long-term incentive plans"). Long-term incentive compensation encompassed two main components. The first was the Dex One Corporation 2009 Long-Term Incentive Program for Executive Officers ("LTIP"), a performance-based, cash incentive program established in February 2009. Id. For 2010, the Compensation and Benefits Committee followed the LTIP as formulated in February 2009. See id. The metrics used to calculate LTIP payments measured executive performance "based on the achievement of certain performance measures related to the amount of Dex One's cumulative free cash flow for" a given fiscal year. Id. Blondy, Bednarz, Hianik, Greene, and Swanson received half of their 2010 compensation due under the LTIP in a cash payment made in February 2010. Id. Mockett did not receive a cash payment under the LTIP. Id. The second component of long-term incentive compensation was stock appreciation rights. See id. 19. Stock

5

appreciation rights were granted on March 1, 2010, without regard to executive performance. See id. Blondy, Bednarz, Hianik, Greene, and Swanson received stock appreciation rights. Id. Mockett did not, but he did receive stock options and Dex One common stock in September 2010. Id.

Under the 2010 Executive Compensation Plan, Blondy received $3,661,288 in total compensation, 297.7 percent more than he received in 2009. Am. Compl. ¶¶ 55, 57. Bednarz received $2,865,698 in total compensation, 238.1 percent more than he received in 2009. Id. Hianik received $1,578,235 in total compensation, 148.5 percent more than he received in 2009. Id. Greene received $1,244,537 in total compensation, 103 percent more than he received in 2009. Id. Swanson received $8,020,297 in total compensation, 1.6 percent more than he received in 2009. Id. Mockett received $5,165,249 in total compensation. 2011 Proxy Statement 22.

On March 17, 2011, Dex One's Board solicited a shareholder vote on, among other things, the 2010 Executive Compensation Plan. See id. 1, 36. In preparation for that vote, Dex One submitted a proxy statement to its shareholders ("2011 Proxy Statement"). See 2011 Proxy Statement. The 2011 Proxy Statement detailed the structure, components, nature, and purposes of the 2010 Executive Compensation Plan, and disclosed the specific 2010 compensation Mockett, Blondy, Bednarz, Hianik, Greene, and Swanson received pursuant to it. See id. 13–32.

In the 2011 Proxy Statement, the Board recommended that Dex One shareholders vote to approve the 2010 Executive Compensation Plan. Id. 1, 36. In doing so, the Board stated that the stockholder vote on the 2010 Executive Compensation Plan was advisory only, and did not bind Dex One, its Board, or its Compensation and Benefits Committee in any way. Id. 2–3, 35–36; see id. 37. The Board, however, explained that the vote's advisory nature did not render the vote meaningless: "[T]o the extent there is any significant vote against the [2010 Executive Compensation Plan] as disclosed in [the 2011] proxy statement," the Board and the Compensation and Benefits Committee "will consider such stockholders' concerns and the Compensation and Benefits Committee will evaluate whether any actions are necessary to address those concerns." Id. 36.

6

On May 3, 2011, Dex One shareholders voted on the 2010 Executive Compensation Plan. In this "say-on-pay vote," fifty-two percent of voting Dex One shareholders rejected the plan. See Am. Compl. ¶¶ 64–65; Dex One, Form 8-K (May 6, 2011), available at http://ir.dexone.com/sec.cfm?DocType=Current&Year=2011&FormatFilter=(last visited Sept. 25, 2012) ("Form 8-K"); Dex One, Form 14A at 13 (Mar. 22, 2012), available at http://ir.dexone.com/sec.cfm?DocType=Proxy&Year=2012&FormatFilter= (last visited Sept. 25, 2012) ("2012 Proxy Statement"). In response, the Compensation and Benefits Committee and the Corporate Governance Committee[2] "held numerous meetings and carefully considered the results of the 2011 Say-on-Pay" vote. 2012 Proxy Statement 13. The Board as a whole also considered and investigated shareholder concerns. See id. The Compensation and Benefits Committee decided not to amend or alter the 2010 Executive Compensation Plan, or to recoup any portion of the compensation paid under it. See Am. Compl. ¶¶ 12–13, 66, 116. The committee did, however, implement other changes to Dex One's compensation practices in response to the May 3, 2011 negative say-on-pay vote. See 2012 Proxy Statement 13.

Dissatisfied with Dex One's 2010 compensation practices, on September 1, 2011, Haberland filed suit derivatively on behalf of Dex One. See Compl. Haberland's complaint presents four claims: (1) that defendants breached their fiduciary duties by issuing a 2011 Proxy Statement that falsely and misleadingly described the 2010 Executive Compensation Plan as a strict pay-for-performance scheme, id. ¶¶ 82–91; (2) that defendants breached their fiduciary duties by paying Mockett, Blondy, Bednarz, Hianik, Greene, and Swanson significant 2010 compensation, and especially by increasing Blondy's, Bednarz's, Hianik's, Greene's, and Swanson's compensation from 2009 to 2010, despite that the New York Stock Exchange suspended trading of RHD's stock for

---

[2] The Corporate Governance Committee is a three-member committee. At all relevant times, it comprised the same three directors who constituted the Compensation and Benefits Committee: Kuersteiner, McEachen, and Schultz. See 2011 Proxy Statement 11–12; 2012 Proxy Statement 10–11.

7

2009 and January 2010, despite that Dex One spent the first month of 2010 in Chapter 11 bankruptcy, and despite that Dex One's share price dropped between February 1, 2010, and December 31, 2010, id. ¶¶ 92–98; (3) that defendants breached their fiduciary duties by failing to alter or amend the 2010 Executive Compensation Plan, to recoup any of the compensation paid under that plan, or to issue any other response to the May 3, 2011 negative say-on-pay vote, id. ¶¶ 99–105; and (4) that defendants were unjustly enriched by the 2010 Executive Compensation Plan, id. ¶¶ 106–09. Haberland also alleges that defendants aided and abetted each other in committing these wrongful acts. Id. ¶¶ 40–41.

On October 31, 2011, defendants moved to dismiss the complaint. On December 23, 2011, Haberland responded in opposition to defendants' motion to dismiss, and on January 20, 2012, defendants replied.

On March 22, 2012, Dex One distributed a proxy statement ("2012 Proxy Statement") to its shareholders, in which Dex One's Board solicited a shareholder vote to, among other things, re-elect the Board and approve the executive compensation plan for 2011 ("2011 Executive Compensation Plan"). See 2012 Proxy Statement. The 2012 Proxy Statement discussed the May 3, 2011 negative say-on-pay vote and the Board's, the Compensation and Benefits Committee's, and the Corporate Governance Committee's response to it. See id. 13. But the 2012 Proxy Statement did not expressly disclose this litigation. See id.; Am. Compl. ¶¶ 15–16, 68–73. Consequently, on March 27, 2012, Haberland filed an amended complaint [D.E. 35]. Haberland's amended complaint raises five claims: (1) that defendants breached their fiduciary duties by issuing a 2011 Proxy Statement that falsely and misleadingly described the 2010 Executive Compensation Plan as a strict pay-for-performance scheme, Am. Compl. ¶¶ 88–97; (2) that Bulkeley, Davis, Kuersteiner, Liddell, McEachen, Mockett, Schultz, and Hianik breached their fiduciary duties by failing to disclose the fact of this litigation in the 2012 Proxy Statement, id. ¶¶ 98–106; (3) that defendants breached their fiduciary duties by paying Mockett, Blondy, Bednarz, Hianik, Greene, and Swanson significant 2010

8

compensation, and by increasing Blondy's, Bednarz's, Hianik's, Greene's, and Swanson's compensation from 2009 to 2010, despite that the New York Stock Exchange suspended trading of RHD's stock for 2009 and January 2010, despite that Dex One spent the first month of 2010 in Chapter 11 bankruptcy, and despite that Dex One's share price dropped between February 1, 2010, and December 31, 2010, id. ¶¶ 107–13; (4) that defendants breached their fiduciary duties by failing to alter or amend the 2010 Executive Compensation Plan, or to recoup any compensation paid under it, in response to the May 3, 2011 negative say-on-pay vote, id. ¶¶ 114–20; and (5) that defendants were unjustly enriched by the 2010 Executive Compensation Plan, id. ¶¶ 121–24. Haberland also alleges that defendants aided and abetted each other in committing these wrongful acts. Id. ¶¶ 42–43.

On April 4, 2012, defendants moved to strike the amended complaint, see Defs.' Mot. Strike, and filed a supporting memorandum [D.E. 46]. On April 5, 2012, Haberland moved for leave to amend the complaint. See Pl.'s Mot. Leave. On April 26, 2012, defendants filed a memorandum opposing Haberland's motion for leave to amend his complaint [D.E. 54].

II.

A party may amend his pleading once as a matter of course within twenty-one days after service, or, if the pleading requires a response, within twenty-one days after service of the response or service of a motion under Rule 12(b), (e), or (f). Fed. R. Civ. P. 15(a)(1). Otherwise, a party may amend his pleading only with the written consent of the opposing party or with leave of court. Fed. R. Civ. P. 15(a)(2). Generally, a court should freely grant leave to amend a complaint. E.g., Steinburg v. Chesterfield Cnty. Planning Comm'n, 527 F.3d 377, 390 (4th Cir. 2008).

Here, Haberland filed his complaint on September 1, 2011. See Compl. On October 31, 2011, defendants moved to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6). See Defs.' Mot. Dismiss. Under Rule 15(a), Haberland had twenty-one days from October 31, 2011, within which to file an amended complaint. Haberland, however, did not file an amended complaint until

9

March 27, 2012, well beyond Rule 15(a)'s twenty-one day window. See [D.E. 35]. Haberland could file that amended complaint only with defendants' consent or with leave of court. He had neither. Accordingly, on April 4, 2012, defendants moved to strike Haberland's amended complaint. See Defs.' Mot. Strike. In response, on April 5, 2012, Haberland moved for leave to file the amended complaint. See Pl.'s Mot. Leave.

Haberland filed the amended complaint outside Rule 15(a)'s twenty-one day window. Without defendants' consent and without leave of court, the filing was improper under Rule 15(a). Nevertheless, to adjudicate Haberland's claims on their merits, the court grants Haberland's April 5, 2012 motion for leave to file the amended complaint. The court now reviews the amended complaint to determine whether Haberland has stated a claim upon which relief may be granted.

III.

In analyzing a motion to dismiss for failure to state a claim upon which relief can be granted, a court must determine whether the complaint is legally and factually sufficient. See Fed. R. Civ. P. 12(b)(6); Ashcroft v. Iqbal, 556 U.S. 662, 677–80 (2009); Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555–56, 563 (2007); Coleman v. Md. Ct. of Appeals, 626 F.3d 187, 190 (4th Cir. 2010), aff'd, 132 S. Ct. 1327 (2012); Giarratano v. Johnson, 521 F.3d 298, 302 (4th Cir. 2008). A court need not accept a complaint's "legal conclusions, elements of a cause of action, and bare assertions devoid of further factual enhancement . . . ." Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc., 591 F.3d 250, 255 (4th Cir. 2009); see also Iqbal, 556 U.S. at 677–80. Similarly, a court "need not accept as true unwarranted inferences, unreasonable conclusions, or arguments." Giarratano, 521 F.3d at 302 (quotation omitted); see Iqbal, 556 U.S. at 677–80.

In analyzing a Rule 12(b)(6) motion to dismiss, a court may consider "documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 322 (2007). Specifically, courts may take judicial notice of federally regulated filings, including Securities and Exchange Commission

10

("SEC") filings. See Fed. R. Evid. 201(b)(2); Ganey v. PEC Solutions, Inc. (In re PEC Solutions, Inc. Sec. Litig.), 418 F.3d 379, 388 n.7, 390 n.10 (4th Cir. 2005); In re Wachovia Corp. ERISA Litig., Civil No. 3:09cv262, 2010 WL 3081359, at *2 n.4 (W.D.N.C. Aug. 6, 2010) (unpublished); In re Duke Energy ERISA Litig., 281 F. Supp. 2d 786, 790 n.4 (W.D.N.C. 2003). Likewise, courts may consider documents that are referenced in and central to the complaint, and the authenticity of which neither party questions. See Daniels-Hall v. Nat'l Educ. Ass'n, 629 F.3d 992, 998 (9th Cir. 2010); Marder v. Lopez, 450 F.3d 445, 448 (9th Cir. 2006); Darcangelo v. Verizon Commc'ns, Inc., 292 F.3d 181, 195 n.5 (4th Cir. 2002); Kramer v. Time Warner Inc., 937 F.2d 767, 773–74 (2d Cir. 1991). A court may consider such documents even if they are not attached to or incorporated by reference in the complaint. See Fed. R. Evid. 201(b)(2); Daniels-Hall, 629 F.3d at 998; Marder, 450 F.3d at 448; In re PEC Solutions, 418 F.3d at 388 n.7, 390 n.10; Darcangelo, 292 F.3d at 195 n.5; Kramer, 937 F.2d at 773–74; In re Wachovia Corp., 2010 WL 3081359, at *2 n.4; In re Duke Energy, 281 F. Supp. 2d at 790 n.4. Moreover, courts need not accept as true a plaintiff's factual allegations to the extent they contradict such documents. See, e.g., Veney v. Wyche, 293 F.3d 726, 730 (4th Cir. 2002); Fayetteville Investors v. Commercial Builders, Inc., 936 F.2d 1462, 1465 (4th Cir. 1991).

Here, the court may consider the 2011 Proxy Statement, the 2012 Proxy Statement, and the May 6, 2011 Form 8-K when analyzing defendants' motion to dismiss. All three documents were filed with the SEC pursuant to federal regulations. Furthermore, Haberland repeatedly references the 2011 and 2012 Proxy Statements in his amended complaint, both proxy statements are central to the claims Haberland raises in his amended complaint, and no party challenges the authenticity of either proxy statement. Thus, the court may consider the statements in the 2011 Proxy Statement, the 2012 Proxy Statement, and the May 6, 2011 Form 8-K when examining Haberland's claims. See Fed. R. Evid. 201(b)(2); Daniels-Hall, 629 F.3d at 998; Marder, 450 F.3d at 448; In re PEC Solutions, 418 F.3d at 388 n.7, 390 n.10; Darcangelo, 292 F.3d at 195 n.5; Kramer, 937 F.2d at

11

773–74; In re Wachovia Corp., 2010 WL 3081359, at *2 n.4; In re Duke Energy, 281 F. Supp. 2d at 790 n.4. To the extent Haberland's factual allegations conflict with the information provided in those documents, the court may reject them. See, e.g., Veney, 293 F.3d at 730; Fayetteville Investors, 936 F.2d at 1465.

Because this case is in federal court on diversity jurisdiction, see Am. Compl. ¶ 18, state substantive law controls. See Erie R.R. Co. v. Tompkins, 304 U.S. 64, 78 (1938). To determine which state's law governs, the court relies on North Carolina's choice-of-law rules. See Day & Zimmermann, Inc. v. Challoner, 423 U.S. 3, 4–5 (1975) (per curiam); Klaxon Co. v. Stentor Elec. Mfg. Co., Inc., 313 U.S. 487, 496–97 (1941). Under North Carolina law, the substantive law of a corporation's state of incorporation governs suits involving "[the] corporation's internal affairs—matters peculiar to the relationships among or between the corporation and its current officers, directors, and shareholders . . . ." Bluebird Corp. v. Aubin, 188 N.C. App. 671, 680–81, 657 S.E.2d 55, 63 (2008); see N.C. Gen. Stat. § 55-7-47. Here, Dex One is incorporated in Delaware. See Am. Compl. ¶ 22. Thus, Delaware substantive law governs the disputes concerning Dex One's internal affairs.

A.

Haberland's first claim alleges that defendants violated their fiduciary duties by making materially false and misleading statements in the 2011 Proxy Statement. See id. ¶¶ 88–97. Haberland contends that the 2011 Proxy Statement described the 2010 Executive Compensation Plan as a strict pay-for-performance system that "align[ed] executive pay with performance, both annual and long-term," and that "strongly link[ed] the interests of executives to those of the Company's shareholders . . . ." Id. ¶ 95 (quotations and emphasis removed) (first alteration in original); see id. ¶¶ 6, 13, 51–54, 56. In other words, Haberland contends that the 2010 compensation paid to Mockett, Blondy, Bednarz, Hianik, Greene, and Swanson was to be tied directly to their 2010 performance. See id. ¶¶ 51–57, 95. Measuring performance based on Dex One's share price, on the

12

fact that Dex One was in Chapter 11 bankruptcy from May 28, 2009 until January 29, 2010, and on the fact that the New York Stock Exchange suspended trading of RHD's stock from December 31, 2008 until February 1, 2010, Haberland asserts that Mockett, Blondy, Bednarz, Hianik, Greene, and Swanson performed poorly in 2010, and that their 2010 compensation should have been correspondingly low. See id. ¶¶ 7, 9, 13, 51, 54, 56, 95. Yet, those executive officers' 2010 compensation was substantial. See id. ¶¶ 51, 55, 95. Furthermore, Blondy's, Bednarz's, Hianik's, Greene's, and Swanson's compensation increased from 2009 to 2010. Id. ¶¶ 7, 13, 54–57, 95. Thus, Haberland contends that the 2010 Executive Compensation Plan was not a strict pay-for-performance scheme, and that the 2011 Proxy Statement's contrary representation was materially false and misleading. Id. ¶¶ 6–8, 13, 51–57, 95. Because defendants distributed the 2011 Proxy Statement to shareholders, and because the 2011 Proxy Statement contained materially false and misleading statements, Haberland claims that defendants violated their fiduciary duties. Id. ¶¶ 88–97.

Haberland's first claim fails. Directors and executive officers of Delaware corporations owe the corporation and its shareholders the fiduciary duties of good faith, care, and loyalty. See Gantler v. Stephens, 965 A.2d 695, 708–09 (Del. 2009) (en banc); Malone v. Brincat, 722 A.2d 5, 10 (Del. 1998) (en banc). These fiduciary duties are "unremitting," and must be exercised when directors and executive officers communicate with shareholders. Malone, 722 A.2d at 10; see Gantler, 965 A.2d at 708–09; Loudon v. Archer-Daniels-Midland Co., 700 A.2d 135, 143 (Del. 1997) (en banc); Stroud v. Grace, 606 A.2d 75, 84 (Del. 1992). "It follows a fortiori that when directors [and executive officers] communicate publicly or directly with shareholders about corporate matters the sine qua non of directors' [and executive officers'] fiduciary duty to shareholders is honesty." Malone, 722 A.2d at 10; see Gantler, 965 A.2d at 708–09; Singer v. Magnavox Co., 380 A.2d 969, 977 (Del. 1977), overruled on other grounds by Weinberger v. UOP, Inc., 457 A.2d 701 (Del. 1983) (en banc). Disseminating false or materially misleading information to shareholders violates that fiduciary duty. Malone, 722 A.2d at 12; see Gantler, 965 A.2d at 708–09; Loudon, 700 A.2d at 143; Zirn v. VLI

13

Corp. (Zirn II), 681 A.2d 1050, 1056 (Del. 1996); Stroud, 606 A.2d at 84; Kelly v. Bell, 254 A.2d 62, 71 (Del. Ch. 1969), aff'd, 266 A.2d 878 (Del. 1970).

Here, the 2011 Proxy Statement did not contain any materially false or misleading information. Haberland misunderstands the statements made in the 2011 Proxy Statement, and consequently misrepresents the structure, components, nature, and purposes of the 2010 Executive Compensation Plan as described in that document. The 2011 Proxy Statement did not represent the 2010 Executive Compensation Plan to be a strict pay-for-performance scheme. According to the 2011 Proxy Statement, the 2010 Executive Compensation Plan was designed to achieve six objectives: (1) to "enable the Company to attract and retain the key leadership talent required to successfully execute its business strategy"; (2) to "align executive pay with performance, both annual and long-term"; (3) to "ensure internal equity, both as compared to other executives based upon position and contributions, and to the broader employee population"; (4) to "strongly link the interests of executives to those of the Company's shareholders and other key constituencies"; (5) to "keep the executive compensation practices transparent, in line with best practices in corporate governance"; and (6) to "administer executive compensation on a cost-effective and tax-efficient basis." 2011 Proxy Statement 13; see id. 15 ("The [Compensation and Benefits] Committee intend[ed] that the levels of compensation available to executive officers be competitive with the compensation offered by similar publicly held companies. . . . The Committee's stated objective was to position an executive's total direct remuneration opportunity over time for target performance between the 60th and 75th percentile of the marketplace for the executive's position."), 16 (stating that an executive's total compensation was intended to be "[c]onsistent with the [six] principles of Dex One's executive officer compensation [plan]"). Ignoring four of these six objectives, Haberland seizes on enumerated goals (2) and (4) and argues that they are the only objectives. See Am. Compl. ¶¶ 6, 53–54, 95. Having ripped those two objectives from their broader context, Haberland then brands the 2010 Executive Compensation Plan as "a strict pay-for-performance policy . . . ." Id. ¶

14

13; see id. ¶¶ 6–8, 51–57, 95. It is not. The 2011 Proxy Statement demonstrates that the 2010 Executive Compensation Plan was more complex, more intricate, and more nuanced than Haberland alleges. See 2011 Proxy Statement 13–32, 35–36. The court rejects Haberland's misstated factual allegations. See, e.g., Veney, 293 F.3d at 730; Fayetteville Investors, 936 F.2d at 1465. Thus, Haberland's first claim fails.

Alternatively, even assuming that the 2011 Proxy Statement described the 2010 Executive Compensation Plan as a strict pay-for-performance scheme—which it did not—Haberland's claim still fails. Haberland measures performance based on Dex One's share price, the fact that Dex One was in Chapter 11 bankruptcy from May 28, 2009 until January 29, 2010, and the fact that the New York Stock Exchange suspended trading of RHD's shares for 2009 and January 2010. See Am. Compl. ¶¶ 7, 9, 13, 51, 54, 56, 95. The 2010 Executive Compensation Plan, however, does not measure executive performance based on any of those criteria. According to the 2011 Proxy Statement, the only performance-based elements of the 2010 Executive Compensation Plan were annual incentive compensation and the LTIP component of long-term incentive compensation. See 2011 Proxy Statement 16–23. Neither was based, in whole or in part, on Dex One's share price. Nor did they impose a direct penalty either for taking Dex One into Chapter 11 bankruptcy or for the New York Stock Exchange's decision to suspend trading of RHD (or even Dex One) stock.[3] Annual incentive compensation, for example, measured performance based on four metrics: (1) ad sales growth, (2) EBITDA, (3) free cash flow, "defined as cash flow from operations, less capital expenditures adjusted for cash restructuring payments and cash reorganization payments," and (4) line of sight, a performance metric designed to capture "specific strategic initiatives and . . . additional critical factors specific to the executive's role," including, for instance, "customer growth,

---

[3] On the contrary, Blondy, Bednarz, Hianik, Greene, and Swanson all received half of their LTIP compensation in February 2010 precisely because they helped Dex One restructure its debt and emerge from Chapter 11 bankruptcy. See 2011 Proxy Statement 18.

15

increased consumer usage, increased digital sales, improved employee engagement scores[,] and achievement of individual departmental budgets." Id. 17. Nowhere did the 2011 Proxy Statement indicate that for purposes of calculating Mockett's, Blondy's, Bednarz's, Hianik's, Greene's, and Swanson's 2010 annual incentive compensation, performance was measured by the three criteria Haberland identifies. See id. 16–17. The metrics used to calculate LTIP payments similarly lacked any reference to Dex One share price, to a direct penalty for causing Dex One to file for Chapter 11 bankruptcy, or to a direct penalty for the New York Stock Exchange's decision to suspend trading of RHD or Dex One shares. LTIP payments were instead "based on the achievement of certain performance measures related to the amount of Dex One's cumulative free cash flow for the . . . 2010 . . . fiscal year[]." Id. 18; cf. id. 17 (defining "free cash flow" as "cash flow from operations, less capital expenditures adjusted for cash restructuring payments and cash reorganization payments").

Haberland fails to challenge the propriety or prudence of, or business justification offered for, the metrics used to calculate annual incentive compensation or LTIP payments. Nor does he allege that Mockett's, Blondy's, Bednarz's, Hianik's, Greene's, and Swanson's 2010 annual incentive compensation or LTIP payments were improperly calculated under those metrics. Rather, Haberland ignores the performance-based metrics described in the 2011 Proxy Statement, invents his own criteria for determining annual incentive compensation and LTIP payments, and argues that Mockett, Blondy, Bednarz, Hianik, Greene, and Swanson failed to meet them. Once more, Haberland's factual allegations conflict with the 2011 Proxy Statement on which Haberland's claim relies. The court rejects those factual allegations. See, e.g., Veney, 293 F.3d at 730; Fayetteville Investors, 936 F.2d at 1465. Haberland's remaining allegations fail to demonstrate that Mockett's, Blondy's, Bednarz's, Hianik's, Greene's, and Swanson's 2010 performance-based compensation exceeded the amount dictated by the performance metrics as actually described in the 2011 Proxy Statement. Thus, even if the 2011 Proxy Statement described the 2010 Executive Compensation Plan as a strict

pay-for-performance scheme, Haberland fails to demonstrate that defendants did not in fact pay for performance as actually measured under the plan. In short, Haberland fails to plausibly allege that defendants breached their fiduciary duties by making materially false and misleading statements in the 2011 Proxy Statement. Accordingly, Haberland's first claim fails.

B.

In his second claim, Haberland alleges that Bulkeley, Davis, Kuersteiner, Liddell, McEachen, Mockett, Schultz, and Hianik breached their fiduciary duties by issuing false and misleading statements in the 2012 Proxy Statement. Am. Compl. ¶¶ 98–106. Specifically, Haberland alleges that the 2012 Proxy Statement solicited shareholder votes to re-elect the Board and to approve the 2011 Executive Compensation Plan, but did not disclose the existence of this litigation. Id. ¶¶ 68–73, 104. Haberland alleges that the omission is material, and that Bulkeley, Davis, Kuersteiner, Liddell, McEachen, Mockett, Schultz, and Hianik therefore violated their fiduciary duties. Id. ¶¶ 98–106.

"[D]irectors [and executive officers] of Delaware corporations are under a fiduciary duty to disclose fully and fairly all material information within the board's control when it seeks shareholder action." Stroud, 606 A.2d at 84; see Gantler, 965 A.2d at 710; Malone, 722 A.2d at 10–12; Loudon, 700 A.2d at 143; Zirn II, 681 A.2d at 1056. Directors therefore may not omit material facts from proxy statements when they solicit shareholder votes. "An omitted fact is material if there is a substantial likelihood that a reasonable stockholder would consider it important in deciding how to vote." Loudon, 700 A.2d at 143; see Arnold v. Soc'y for Savs. Bancorp, Inc., 650 A.2d 1270, 1277 (Del. 1994) (en banc); Rosenblatt v. Getty Oil Co., 493 A.2d 929, 944 (Del. 1985). Stated differently, a plaintiff cannot prevail on a material-omission claim unless the plaintiff "demonstrate[s] a substantial likelihood that, under all the circumstances, the omitted fact would have assumed actual significance in the deliberations of the reasonable stockholder." Loudon, 700 A.2d at 143; see McMullin v. Beran, 765 A.2d 910, 925 (Del. 2000). To meet this standard, an

17

omitted fact need not "be of such import that its revelation would cause an investor to change his vote." Zirn v. VLI Corp. (Zirn I), 621 A.2d 773, 779 (Del. 1993); see Barkan v. Amsted Indus., Inc., 567 A.2d 1279, 1289 (Del. 1989). But the omitted fact must be substantially likely, from the perspective of the reasonable stockholder, to have "significantly altered the total mix of information made available." Loudon, 700 A.2d at 143 (quotation omitted); see TSC Indus., Inc. v. Northway, Inc., 426 U.S. 438, 449 (1976). When determining whether an omitted fact is substantially likely to have significantly altered the total mix of information available, courts may consider the information disclosed directly to shareholders as well as that which was publicly available at the time of the alleged omission. See Citron v. Fairchild Camera & Instrument Corp., 569 A.2d 53, 70–71 (Del. 1989); In re Oracle Corp., 867 A.2d 904, 940 (Del. Ch. 2004), aff'd, 872 A.2d 960, 2005 WL 877903 (Del. 2005) (per curiam) (unpublished table decision). An omitted fact is not material when the facts underlying it are fully disclosed and publicly available. See Orman v. Cullman, 794 A.2d 5, 33–34 (Del. Ch. 2002); O'Reilly v. Transworld Healthcare, Inc., 745 A.2d 902, 925–26 (Del. Ch. 1999); Wilen v. Pollution Control Indus., Inc., No. 7254, 1984 WL 8272, at *4–5 (Del. Ch. Oct. 15, 1984) (unpublished).

Here, the mere fact of this litigation was not material. When Dex One distributed the 2012 Proxy Statement on March 22, 2012, Haberland had filed only his original complaint. That complaint concerns the 2010 Executive Compensation Plan and the 2011 Proxy Statement. Haberland's original complaint contends that the 2011 Proxy Statement represented the 2010 Executive Compensation Plan to be a strict pay-for-performance scheme, that Mockett, Blondy, Bednarz, Hianik, Greene, and Swanson performed poorly in 2010, that those executives nevertheless received significant, and in most cases substantially increased, compensation for 2010, and therefore that the 2011 Proxy Statement's description of the 2010 Executive Compensation Plan as a strict pay-for-performance scheme was materially false and misleading. Compl. ¶¶ 2, 6–9, 13, 49–55, 66, 82–91. Haberland's original complaint also alleges that defendants breached their fiduciary duties

18

by overpaying Mockett, Blondy, Bednarz, Hianik, Greene, and Swanson. Id. ¶¶ 2, 8–9, 13, 49, 52–55, 66, 92–98. Furthermore, Haberland contends that on May 3, 2011, Dex One shareholders rejected the 2010 Executive Compensation Plan, but that defendants never altered or amended the plan, never recouped any compensation paid under it, and otherwise never responded to the negative say-on-pay vote. Id. ¶¶ 11–12, 57–58, 63–65, 99–105. Finally, Haberland asserts that Dex One's 2010 Executive Compensation Plan unjustly enriched defendants. Id. ¶¶ 2, 8, 50, 53–55, 106–09.

Dex One publicly disclosed the facts underlying all of these claims. First, Haberland contends that 2010 executive performance was based on the value of Dex One's shares, the fact of Dex One's Chapter 11 bankruptcy, and the fact that the New York Stock Exchange suspended trading RHD shares from December 31, 2008 to February 1, 2010. Id. ¶¶ 2, 7, 9, 13, 49, 52, 54, 66, 89, 94. Even assuming those three criteria were used to determine 2010 executive performance—which they were not—information regarding them was publicly available from numerous sources.

Second, over the course of twenty-two pages, the 2011 Proxy Statement detailed the 2010 Executive Compensation Plan. See 2011 Proxy Statement 13–32, 35–36. It enumerated the six goals of the compensation plan. See id. 13. It described the structure of the compensation plan, including the components and metrics used to calculate the total compensation each executive received. See id. 15–32. It explained how each component and metric was used to achieve the plan's six objectives. See id. 16–19. It disclosed the compensation each executive received pursuant to the 2010 Executive Compensation Plan. See id. 16–32. Specifically, the 2011 Proxy Statement provided (1) the base salary each executive received, id. 16, (2) the specific performance thresholds each executive had to meet to receive annual incentive compensation, as well as the actual annual incentive compensation each executive received, id. 16–17, (3) the specific cash payment each executive received under Dex One's LTIP, id. 18, (4) the number of stock appreciation rights each executive received under the LTIP and the approximate value of those rights when they were

19

granted, id. 19, (5) the number and value of common-stock shares and stock options Mockett received, id., (6) the total compensation each executive received, summarized in a table subdivided by salary, bonus, stock awards, option awards, non-equity incentive plan compensation, change in pension value and non-qualified deferred compensation earnings, and a miscellaneous category of "[a]ll [o]ther [c]ompensation," id. 22, (7) a series of tables delineating components of certain compensation categories identified in the summary table, and the specific payment each executive received for each of those components, id. 23–29, and (8) the specific value of each executive's termination, death, and disability benefits, id. 29–32. When Dex One distributed the 2012 Proxy Statement on March 22, 2012, the 2011 Proxy Statement and its detailed description of the 2010 Executive Compensation Plan had been filed with the SEC and was publicly available.

Third, the 2012 Proxy Statement described the outcome of the May 3, 2011 say-on-pay vote, candidly acknowledging that "[o]f [the] total shares voting on the 2011 Say-on-Pay Proposal, 48% supported the [2010 Executive Compensation Plan] and 52% voted against the [plan]." 2012 Proxy Statement 13. Dex One's Form 8-K, filed with the SEC on May 6, 2011, and publicly available when Dex One distributed the 2012 Proxy Statement, also disclosed that Dex One shareholders rejected the 2010 Executive Compensation Plan on May 3, 2011. See Form 8-K. Moreover, the 2012 Proxy Statement described the changes made to Dex One's compensation practices in response to the May 3, 2011 negative say-on-pay vote. 2012 Proxy Statement 13.

In short, the 2012 Proxy Statement, which was provided to Dex One shareholders on March 22, 2012, and the 2011 Proxy Statement and Form 8-K, both of which were publicly available when Dex One distributed the 2012 Proxy Statement, provided all of the facts underlying the claims raised in Haberland's original complaint. Accordingly, disclosing the fact of this litigation would have added nothing to "the total mix of information made available." Loudon, 700 A.2d at 143 (quotation omitted); see Orman, 794 A.2d at 33–34; O'Reilly, 745 A.2d at 925–26; Wilen, 1984 WL 8272, at *4–5. Even if the omitted fact could have added to the total mix of information available, it would

have been so inconsequential to the reasonable stockholder that it would not have been substantially likely to have "significantly altered the total mix of information made available." Loudon, 700 A.2d at 143 (quotation omitted) (emphasis added); see Orman, 794 A.2d at 33–34; O'Reilly, 745 A.2d at 925–26; Wilen, 1984 WL 8272, at *4–5. Either way, the mere fact of this litigation was not material, and Bulkeley, Davis, Kuersteiner, Liddell, McEachen, Mockett, Schultz, and Hianik had no duty to disclose it. See Stroud, 606 A.2d at 84 n.1 (requiring only that a "board disclose[] all material facts relevant to the issue [submitted for a shareholder vote]" (emphasis removed)).

Alternatively, even if the fact of this litigation had been material, Bulkeley, Davis, Kuersteiner, Liddell, McEachen, Mockett, Schultz, and Hianik were not obligated to disclose it. "[T]o comport with its fiduciary duty to disclose all relevant material facts, [neither a company's] board [nor its corporate executives] is . . . required to engage in self-flagellation . . . ." Id.; see Loudon, 700 A.2d at 143–45. Disclosing this litigation, however, would do just that. As explained, Haberland's complaint misrepresents the structure, components, nature, and purposes of the 2010 Executive Compensation Plan as described in the 2011 Proxy Statement. Furthermore, as detailed in this order, Haberland's complaint similarly misstates defendants' representations to shareholders before, and response after, the May 3, 2011 negative say-on-pay vote. His complaint instead presents sensationalized and meritless allegations. Bulkeley, Davis, Kuersteiner, Liddell, McEachen, Mockett, Schultz, and Hianik bore no obligation to engage in self-flagellation by disclosing them. Accordingly, Haberland's second claim fails.

C.

In his third claim, Haberland challenges defendants' 2010 compensation practices. Am. Compl. ¶¶ 107–13. Specifically, Haberland alleges that the 2010 Executive Compensation Plan was a strict pay-for-performance scheme, that Mockett's, Blondy's, Bednarz's, Hianik's, Greene's, and Swanson's 2010 performance was poor, but that Mockett, Blondy, Bednarz, Hianik, Greene, and Swanson nonetheless received substantial, and in most cases significantly increased, 2010

21

compensation. Id. ¶¶ 7–9, 13, 51–52, 54–55, 109. Based on these facts, Haberland contends that Mockett, Blondy, Bednarz, Hianik, Greene, and Swanson could not have been paid exclusively for their performance, and that the 2010 compensation paid to those executives violated the 2010 Executive Compensation Plan. Id. ¶ 109. Accordingly, Haberland alleges that defendants' violated their fiduciary duties by paying Mockett, Blondy, Bednarz, Hianik, Greene, and Swanson the compensation those executives received for 2010. Id.

Haberland's third claim fails. First, Haberland does not allege that Blondy, Bednarz, Hianik, Greene, and Swanson directly approved or authorized their 2010 compensation. See id. ¶¶ 51–56 (alleging that only the Board was responsible for Mockett's, Blondy's, Bednarz's, Hianik's, Greene's, and Swanson's 2010 compensation). Nor can he. See 2011 Proxy Statement 13 ("Compensation of the named executive officers is determined under the Company's compensation program for senior executives. This program is governed by the Compensation and Benefits Committee of the Board of Directors . . . ."); see also id. 14, 36. Haberland does allege that Blondy, Bednarz, Hianik, Greene, and Swanson aided and abetted the Board in approving and authorizing their 2010 compensation. See Am. Compl. ¶¶ 42–43, 108. But this allegation is simply a legal conclusion devoid of any supporting facts. Accordingly, as to Blondy, Bednarz, Hianik, Greene, and Swanson, the court rejects the aiding and abetting allegation as to Haberland's third claim. See Iqbal, 556 U.S. at 677–80; Nemet Chevrolet, 591 F.3d at 255; Giarratano, 521 F.3d at 302.

As to the remaining defendants, Haberland's third claim rests on a flawed factual foundation. The claim relies on Haberland's allegation that the 2011 Proxy Statement described the 2010 Executive Compensation Plan as a strict pay-for-performance scheme. See Am. Compl. ¶ 109; see also, e.g., id. ¶¶ 13 (describing the 2010 Executive Compensation Plan as "a strict pay-for-performance policy which purportedly hinged upon annual and long-term performance" (quotation omitted)), 39, 51, 53–56. As explained, the plan as described in the 2011 Proxy Statement was much more nuanced than Haberland alleges. Haberland misconstrues the statements made in the 2011

22

Proxy Statement, and misrepresents the structure, components, nature, and purposes of the 2010 Executive Compensation Plan. The court rejects Haberland's allegations as contrary to the 2011 Proxy Statement as actually written and to the 2010 Executive Compensation Plan as actually described. See, e.g., Veney, 293 F.3d at 730; Fayetteville Investors, 936 F.2d at 1465. Haberland's remaining allegations do not challenge the structure, components, nature, and purposes of the 2010 Executive Compensation Plan as actually described. Nor do Haberland's remaining allegations demonstrate that Mockett's, Blondy's, Bednarz's, Hianik's, Greene's, and Swanson's 2010 compensation was improperly calculated under the 2010 Executive Compensation Plan. Thus, Haberland's third claim fails.

D.

In his fourth claim, Haberland alleges that defendants breached their fiduciary duties when they failed to alter or amend the 2010 Executive Compensation Plan, or to recoup any compensation paid pursuant to it, in response to the May 3, 2011 negative say-on-pay vote. Am. Compl. ¶¶ 114–20. Specifically, Haberland alleges that on March 17, 2011, through the 2011 Proxy Statement, Dex One shareholders were notified of their opportunity to approve or reject the 2010 Executive Compensation Plan. See id. ¶ 58. In the 2011 Proxy Statement, Haberland contends, the Dex One Board and Compensation and Benefits Committee promised to take action in response to any significant vote against the 2010 Executive Compensation Plan. Id. ¶ 59. On May 3, 2011, a majority of Dex One shareholders rejected the 2010 Executive Compensation Plan. Id. ¶¶ 64–65; see Form 8-K; 2012 Proxy Statement 13. Thereafter, the Dex One Board and Compensation and Benefits Committee failed to alter or amend the 2010 Executive Compensation Plan, or to recoup any compensation paid pursuant to the plan, in response to the May 3, 2011 negative say-on-pay vote. See Am. Compl. ¶¶ 12–13, 66, 116.

Haberland's fourth claim fails. First, Haberland does not allege that Blondy, Bednarz, Hianik, Greene, and Swanson had any direct duty to respond to the May 3, 2011 negative say-on-pay

23

vote. See id. ¶¶ 12–13, 59, 66, 116. Indeed, he cannot. The Compensation and Benefits Committee, a standing committee of the Dex One Board comprised of Kuersteiner, McEachen, and Schultz, see 2011 Proxy Statement 11–12; Am. Compl. ¶ 36; 2012 Proxy Statement 10–11, "is [the body principally] responsible for the oversight of [Dex One's] executive . . . compensation practices and programs and the administration of [Dex One's] compensation and benefit plans for employees (including senior management) . . . . The Compensation and Benefits Committee is responsible for reviewing and approving all aspects of the compensation paid to" Mockett, Blondy, Bednarz, Hianik, Greene, and Swanson. 2011 Proxy Statement 6; see id. 13 ("Compensation of the named executive officers is determined under the Company's compensation program for senior executives. This program is governed by the Compensation and Benefits Committee of the Board of Directors . . . . Currently, the Committee determines the compensation of all of the Company's executive officers."). In most instances, the Compensation and Benefits Committee's authority is final. See id. 14. The Compensation and Benefits Committee's final authority gives way only in the context of CEO compensation, which must be reviewed and approved by the independent directors of the full Board. See id. Contrary to the authority exercised by the Compensation and Benefits Committee, and occasionally by the independent directors of the full Board, Blondy, Bednarz, Hianik, Greene, and Swanson played no role in determining 2010 executive compensation. See id. 6, 13–14. Consistent with this division of authority, only the Board and the Compensation and Benefits Committee promised to consider shareholder concerns in the event of a significant vote against the 2010 Executive Compensation Plan. Id. 36. Only the Compensation and Benefits Committee promised to evaluate whether any responsive actions were necessary. Id. Accordingly, "[f]ollowing the 2011 Annual Meeting of Stockholders, the [Compensation and Benefits] Committee and the Corporate Governance Committee"—not Blondy, Bednarz, Hianik, Greene, and Swanson—"held numerous meetings and carefully considered the results of the 2011 Say-on-Pay [vote]." 2012 Proxy Statement 13. The larger Board likewise investigated shareholder concerns. See id. The Compensation and

24

Benefits Committee then decided on and implemented necessary changes. Id. Based on the allegations in Haberland's amended complaint and on the information provided in the 2011 and 2012 Proxy Statements, Blondy, Bednarz, Hianik, Greene, and Swanson had no duty to alter or amend the 2010 Executive Compensation Plan, or to recoup for Dex One any compensation paid under it, in response to the May 3, 2011 negative say-on-pay vote, and played no direct role in allegedly failing to do so. Haberland, however, alleges that Blondy, Bednarz, Hianik, Greene, and Swanson aided and abetted the Board and the Compensation and Benefits Committee in allegedly failing to alter or amend the 2010 Executive Compensation Plan, or to recoup any compensation paid under it, in response to the May 3, 2011 negative say-on-pay vote. See Am. Compl. ¶¶ 42–43, 115, 118. But that allegation is simply a legal conclusion without any supporting facts. Accordingly, the court rejects the aiding and abetting allegation as to Blondy, Bednarz, Hianik, Greene, and Swanson. See Iqbal, 556 U.S. at 677–80; Nemet Chevrolet, 591 F.3d at 255; Giarratano, 521 F.3d at 302.

Haberland's fourth claim likewise fails as to Mockett, Bulkeley, Davis, Kuersteiner, Liddell, McEachen, and Schultz. Under the Dodd-Frank Wall Street Reform and Consumer Protection Act ("Dodd-Frank Act"), corporations periodically must submit executive compensation plans to shareholders for a vote. See 15 U.S.C. § 78n-1(a)(1). "The shareholder vote referred to in subsection[] (a)," however, "shall not be binding on the [corporation] or the board of directors of [the corporation], and may not be construed . . . as overruling a decision by such [corporation] or board of directors[,] . . . to create or imply any change to the fiduciary duties of such [corporation] or board of directors[,] . . . [or] to create or imply any additional fiduciary duties for such [corporation] or board of directors . . . ." Id. § 78n-1(c)(1)–(3). Thus, to the extent Haberland contends that the Dodd-Frank Act itself imposed any legal duty on Mockett, Bulkeley, Davis, Kuersteiner, Liddell, McEachen, and Schultz to respond to the May 3, 2011 negative say-on-pay vote, the statute's plain language defeats the argument.

Although the Dodd-Frank Act does not require Mockett, Bulkeley, Davis, Kuersteiner,

Liddell, McEachen, and Schultz to respond to the May 3, 2011 negative say-on-pay vote, it also does not preclude them from imposing such an obligation on themselves. Thus, if Mockett, Bulkeley, Davis, Kuersteiner, Liddell, McEachen, and Schultz promised in the 2011 Proxy Statement to take some action in response to a negative say-on-pay vote, they would be bound to do so. See Malone, 722 A.2d at 10 ("Whenever directors communicate publicly or directly with shareholders about the corporation's affairs, with or without a request for shareholder action, directors have a fiduciary duty to shareholders to exercise due care, good faith and loyalty."); Marhart, Inc. v. CalMat Co., Civ. A. No. 11820, 1992 WL 82365, at *3 (Del. Ch. Apr. 22, 1992) (unpublished) ("[E]ven where there is no obligation to disclose certain information, if it is volunteered, the information must be stated truthfully and candidly."); cf. Freedman v. Rest. Assocs. Indus., Inc., Civ. A. No. 9212, 1990 WL 135923, at *5, 8 (Del. Ch. Sept. 19, 1990) (unpublished). But Mockett, Bulkeley, Davis, Kuersteiner, Liddell, McEachen, and Schultz made no such promise. The 2011 Proxy Statement provided that the shareholder vote on the 2010 Executive Compensation Plan "is advisory, and therefore not binding on Dex One, the Board or the Compensation and Benefits Committee." 2011 Proxy Statement 36. In fact, the 2011 Proxy Statement noted seven different times that the shareholder vote on the 2010 Executive Compensation Plan was advisory only, and did not bind Dex One, its Board, or its Compensation and Benefits Committee in any way. See id. 2–3, 35–36.[4] Nevertheless, the 2011 Proxy Statement provided that "[t]he Board and the Compensation and Benefits Committee values the opinions of [Dex One] stockholders and, to the extent there is any significant vote against the [2010 Executive Compensation Plan] as disclosed in this [2011] proxy statement, [the Board and the Compensation and Benefits Committee] will consider such stockholders' concerns . . . ." Id. 36. After such consideration, "the Compensation and Benefits Committee will evaluate whether any actions are necessary to address those concerns." Id. This

---

[4] The 2011 Proxy Statement also noted thirteen times that shareholder votes on any executive compensation plan are non-binding. See 2011 Proxy Statement 2–3, 37.

26

statement did not change the advisory, non-binding nature of the say-on-pay vote, and did not obligate Dex One's Board or Compensation and Benefits Committee to alter or amend the 2010 Executive Compensation Plan, or to recoup any part of the compensation paid under it, in response to a negative say-on-pay vote. The Board promised only to "consider" stockholder concerns expressed through the vote. Id. The Compensation and Benefits Committee also promised to "consider" stockholder concerns, and to "evaluate whether any actions are necessary to address those concerns." Id. Haberland has not alleged that the Board and the Compensation and Benefits Committee failed to "consider" the May 3, 2011 negative say-on-pay vote, or that the Compensation and Benefits Committee failed to "evaluate whether any actions [were] necessary to address" the concerns raised. Id.; see Am. Compl. ¶¶ 12–13, 66, 116 (alleging only that the Dex One Board members failed to alter or amend the 2010 Executive Compensation Plan, or to recoup any portion of the compensation paid under it). In any event, the information provided in the 2012 Proxy Statement demonstrates that the Board and the Compensation and Benefits Committee kept their promises. See 2012 Proxy Statement 13. Accordingly, Haberland's fourth claim fails.

E.

In his fifth claim, Haberland alleges that defendants were unjustly enriched by their alleged excessive compensation. Am. Compl. ¶¶ 121–24. Specifically, Haberland alleges that "[a]ll the payments and benefits provided to the Defendants based upon or related to Defendants' executive compensation scheme were unjustly awarded . . . ." Id. ¶ 123; see id. ¶¶ 39, 51–52. Haberland requests that defendants be ordered to disgorge their allegedly ill-gotten gains. Id. ¶ 124.

As to Bulkeley, Davis, Kuersteiner, Liddell, McEachen, and Schultz, Haberland's fifth claim fails on the facts. At the time of the acts alleged in the amended complaint, these six defendants were directors of Dex One, not executive officers. See id. ¶¶ 23–27, 29. As directors, Bulkeley, Davis, Kuersteiner, Liddell, McEachen, and Schultz were not compensated under the 2010 Executive Compensation Plan that Haberland attacks. See 2011 Proxy Statement 33–34 (discussing director

27

compensation separately from executive compensation); Am. Compl. ¶¶ 1 ("This action seeks to hold defendants liable for . . . unjust enrichment . . . in connection with the award of excessive and unwarranted 2010 executive compensation . . . ."), 123 (alleging only that the "executive compensation scheme [was] unjustly awarded"). Nor has Haberland pled sufficient facts to hold Bulkeley, Davis, Kuersteiner, Liddell, McEachen, and Schultz liable on this unjust enrichment claim as aiders and abettors. See Am. Compl. ¶¶ 42–43, 121–24; Iqbal, 556 U.S. at 677–80; Nemet Chevrolet, 591 F.3d at 255; Giarratano, 521 F.3d at 302. Haberland's unjust enrichment claim therefore fails to state a claim against Bulkeley, Davis, Kuersteiner, Liddell, McEachen, and Schultz.

Haberland's unjust enrichment claim also fails as to Mockett, Blondy, Bednarz, Hianik, Greene, and Swanson. "Unjust enrichment is the unjust retention of a benefit to the loss of another, or the retention of money or property of another against the fundamental principles of justice or equity and good conscience." Nemec v. Shrader, 991 A.2d 1120, 1130 (Del. 2010) (en banc) (quotation omitted). To prove unjust enrichment, a plaintiff must sufficiently demonstrate "(1) an enrichment, (2) an impoverishment, (3) a relation between the enrichment and impoverishment, (4) the absence of justification and (5) the absence of a remedy provided by law." Otto v. Gore, 45 A.3d 120, 138 (Del. 2012) (en banc) (quotation omitted). Here, Haberland has failed to allege facts sufficient to satisfy the fourth element. In Haberland's unjust enrichment claim, he alleges that Mockett's, Blondy's, Bednarz's, Hianik's, Greene's, and Swanson's 2010 compensation was disproportionate to their 2010 performance. See Am. Compl. ¶¶ 8, 51, 54–57, 122–24. As explained, however, Haberland misunderstands and misconstrues the structure, components, nature, and purposes of Dex One's 2010 Executive Compensation Plan. As described in the 2011 Proxy Statement, the 2010 Executive Compensation Plan is not a strict pay-for-performance scheme. Rather, the plan is designed to fulfill six specifically enumerated objectives. See 2011 Proxy Statement 13, 15–16. Haberland ignores four of those objectives, seizes on the two performance-related objectives, asserts that they are the only relevant objectives, and alleges that Mockett's,

Blondy's, Bednarz's, Hianik's, Greene's, and Swanson's 2010 compensation failed to satisfy them. Furthermore, even assuming that the 2010 Executive Compensation Plan was a strict pay-for-performance scheme, Haberland has not challenged as improper, invalid, or unjustifiable the metrics actually used in the 2010 Executive Compensation Plan to measure executive performance. Nor has Haberland demonstrated that Mockett, Blondy, Bednarz, Hianik, Greene, and Swanson failed to satisfy the performance metrics actually used in the 2010 Executive Compensation Plan. Nor, finally, has Haberland alleged that the compensation paid to Mockett, Blondy, Bednarz, Hianik, Greene, and Swanson under the 2010 Executive Compensation Plan conflicted with those metrics. Haberland instead redefines performance based on Dex One's stock price, the fact of Dex One's Chapter 11 bankruptcy, and the fact that the New York Stock Exchange suspended trading of RHD shares for 2009 and January 2010. Based on those criteria alone, Haberland argues that, for 2010, Mockett, Blondy, Bednarz, Hianik, Greene, and Swanson were overcompensated. Haberland's argument is too flawed to survive. Haberland has failed to plausibly allege that the 2010 Executive Compensation Plan, as actually conceived, resulted in unjust enrichment to Mockett, Blondy, Bednarz, Hianik, Greene, and Swanson. Accordingly, Haberland's unjust enrichment claim fails.

Finally, in light of this court's analysis of Haberland's amended complaint, the court need not and does not address defendants' argument that Haberland failed to comply with Delaware's demand requirement for shareholder derivative claims and that Haberland failed to plausibly plead demand futility under Delaware law. See, e.g., Brehm v. Eisner, 746 A.2d 244, 256–57 (Del. 2000) (en banc); Aronson v. Lewis, 473 A.2d 805, 811, 814–15 (Del. 1984), overruled on other grounds by Brehm, 746 A.2d 244. Likewise, the court need not and does not address defendants' argument that the business judgment rule defeats Haberland's claims. See, e.g., Brehm, 746 A.2d at 265–66; Aronson, 473 A.2d at 812–13.

## IV.

In sum, the court DENIES defendants' motion to strike plaintiff's amended complaint [D.E.

44], and GRANTS plaintiff's motion for leave to amend the complaint [D.E. 47]. The court GRANTS defendants' motion to dismiss [D.E. 25] and DISMISSES plaintiff's complaint [D.E. 1] and amended complaint [D.E. 35, 47-2].

SO ORDERED. This **26** day of September 2012.

JAMES C. DEVER III
Chief United States District Judge